## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES HOLDER,

                              Plaintiff,                          OPINION AND ORDER

     v.

                                                     16-cv-343-wmc

FRASER SHIPYARDS, INC.,
THE INTERLAKE STEAMSHIP CO.,
and CAPSTAN CORP.,

                              Defendants.

---

Plaintiff James Holder alleges that he suffered from lead poisoning while working on a project to convert the *Herbert C. Jackson*'s propulsion system from steam- to diesel-powered. He sued the ship's owner, The Interlake Steamship Company, alleging negligence under the Longshore and Harbor Workers' Compensation Act (the "Act" or "LHWCA"), 33 U.S.C. § 905(b), as well as Fraser Shipyards, Inc., where the *Jackson* was dry-docked for the upgrade, and Capstan Corporation, Fraser's parent corporation, for negligence under § 933 of the Act.[1] These three defendants highlight different provisions of the Act: § 905(b), the exclusive remedy against vessels;[2] §§ 904, 905(a), the exclusive remedy against employers; and § 933, the remedy against third parties. Before the court are defendants' motions for summary judgment (dkt. ##50, 72, 78), along with plaintiff's

---

[1] While the plaintiff previously alleged negligence against Northern Engineering, the parties stipulated to that defendant's dismissal with prejudice. (Dkt. #89; *see also* Nov. 3, 2017 docket entry terminating Northern.) According, the court need not address Northern's separate arguments for summary judgment.

[2] "It is not a vessel owner's status as a vessel owner that dictates which LHWCA provision a maritime worker may use; it is the type of negligence that the worker alleges and the duty that is owed by the vessel owner that is controlling." *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 292 (5th Cir. 2008).

related request to disregard new evidence and argument in Fraser's reply (dkt. #124).[3]

UNDISPUTED FACTS[4]

## A. Background

Defendant Interlake, the owner of the *Jackson*, is a Delaware corporation that maintains its principal place of business in Ohio. Beginning in 2006, Interlake started a ten-year project to upgrade five ships in its fleet, including converting four to diesel-powered. The last ship due for an upgrade was the *Jackson*. To facilitate this, Interlake entered into a contract on September 30, 2015, with defendant Fraser.

Fraser is a Wisconsin corporation with its principal place of business in Superior, Wisconsin, which provides shipyard services, such as construction, repairs and inspections.

---

[3] Fraser's request to sever or order separate trial for Interlake's cross-claim (dkt. #128) is also under advisement as of December 12, 2017. However, the court will treat this request a motion in limine and reserve ruling on it until closer to trial.

[4] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except as specifically noted. At the outset, the court briefly addresses Capstan and Fraser's rampant use of hearsay objections in their responses to plaintiff's proposed findings of fact, many of which are ill-founded because they are statements of an opposing party, which are categorically not hearsay. *See* Fed. R. Evid. 801(d)(2). The court will not address these repetitive boilerplate hearsay challenges. Similarly, these same defendants repeatedly object on relevance grounds to plaintiff's proposed findings of fact for no apparent purpose. While the court understands that defendants consider many of plaintiff's proposed facts to be "completely irrelevant to the grounds for [their] summary judgment motions," plaintiff only had one opportunity to submit contrary proposed findings of fact to marshal his evidence and attempt to show a genuine, material dispute of fact. Whether objecting or not, defendants were free to argue the relevant facts. Moreover, some of the defendants' relevance objections were baseless, and many more invoked facts that had some "tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401, 402. By and large, therefore, the court will not address these objections further in this opinion either, trusting that kneejerk and pointless blanket objections will not be part of any sides' response to an opposing parties' proposed trial exhibits.

Fraser's work on the *Jackson* was its "first major repowering [project] . . . since the mid-1980s." (Press Release (dkt. #101-2) 5.) The majority of the work Fraser performs occurs at its property in Superior, Wisconsin. Defendant Capstan is Fraser's sole shareholder and parent corporation and it is a Wisconsin corporation, but with an office in Duluth, Minnesota.[5] Defendants Capstan and Fraser are separate corporate entities, with separate workspaces, email domains, corporate logos and websites. They do, however, share a CEO and chairman (Todd Johnson), as well as a treasurer and CFO (Scott Brantly).[6] According to Nicholas Minardi, who is allegedly familiar with Capstan's corporate structure between 2014 and 2016, Capstan and Fraser shifted their approach in 2014 to safety management, so that Capstan would manage safety for Fraser.[7]

Since February 18, 2011, Fraser had a Client Services Agreement with Tradesmen International, under which Tradesmen would assign workers to Fraser. By its terms, this

---

[5] Fraser and then-defendant Northern had proposed a fact that both were solely owned by Fraser Industries, LLC. However, plaintiff apparently chose not to answer because he had already dismissed Northern as a defendant. (*Compare* Pl.'s Resp. to Fraser & N. Eng'g's PFOF (dkt. #96) ¶ 32 *with* Pl.'s Resp. to Capstan's PFOF (dkt. #95) ¶ 3.)

[6] Former defendant Northern, a Wisconsin limited liability company, focuses on repair and renewal of mechanical equipment, conveying and propulsion systems, industrial gear drives, engine heads and valves, analytical assessment and testing, and shaft and bearing equipment. Its sole member is Fraser Industries, LLC, which in turn has a sole member: Capstan. Northern was identified by Fraser as a "related employer" on Fraser's LHWCA insurance.

[7] In response to plaintiff's proposed facts regarding Fraser's reliance on Capstan for safety management, defendants Capstan and Fraser both relied on the same, oft repeated response: "Dispute. This Proposed Finding of Fact is completely irrelevant to the grounds for Capstan and Fraser's summary judgment motions. Fed. R. Evid. 401 and 402." (*See* Capstan & Fraser's Resp. to Pl.'s PFOF (dkt. #111) ¶¶ 86-92.) Because the defendants have failed to put forward evidence disputing plaintiff's assertions, however, the court will take them as true for purposes of summary judgment, leaving the court perplexed as to how the defendants consider these proposed facts "irrelevant," particularly when Capstan argues it is entitled to summary judgment because of its business being interrelated with Fraser's.

agreement specified that Fraser would be "solely responsible for directing, supervising and controlling Tradesmen employees as well as their work." (Client Services Agreement (dkt. #15-1) ¶ 3(a).) This agreement also detailed that Fraser had the right "in its sole discretion, [to] release a Tradesmen employee back to Tradesmen at any time." (*Id.*)

On December 14, 2015, Holder applied for a job as a "ship fitter" with Tradesmen, believing that the job consisted of working for Tradesmen in Superior, Wisconsin. As part of the application process, Holder acknowledged that he would be subject to a background check, including signing off on execution of a background check release form, which referred to Tradesmen as the employer. Holder also received a Tradesmen Employment Orientation Recap, which involved reviewing OSHA training and the Tradesmen Employee Safety Handbook, watching a safety video, and discussing fringe benefits. In addition, he was instructed to report injuries and accidents to Tradesmen for investigation and to direct questions about the Field Employee Policy Manual to his manager. Finally, Holder understood that Tradesmen would manage his employee withholdings.

Beginning in January 2016, Tradesmen assigned workers to Fraser Shipyards for the *Jackson* upgrade, including Holder. Holder disputes that: (1) the Fraser-Tradesmen Client Services Agreement was followed in practice; (2) he acknowledged Fraser's responsibility and authority for his direction and supervision; and (3) he acknowledged being a Fraser employee. Fraser paid Tradesmen for the work done by Holder based on a bill-out rate, multiplied by the number of hours Holder worked.

### B. Holder's Work on the *Jackson*

Holder worked aboard the ship at Fraser's dry dock for 37 days, from January 5

until February 29, 2016.  On the 5th, Holder signed a notice agreeing to abide by Tradesmen's policies, as well as acknowledging that Tradesmen or he could terminate his employment "with or without cause, and with or without notice, at any time."  (Holder Personnel File (dkt. #102-1) 10.)

Holder's work involved "removing and replacing the bottom and side shell on the vessel and also framework," which required him "to burn out the old steel with a torch," make "final cuts, take whatever framework had to be taken out, and go ahead and replac[e] everything with new steel."  (Holder Dep. (dkt. #85) 98:4-15.)  He only worked on the turn-of-the-bilge/ballast area of the ship.  Holder avers that his supervisors were Chris Duncan and Joe Kutzler (apparently misspelled as Cunsler) and that they directed his work, although Fraser and Capstan dispute this.  The parties also dispute whether Duncan and Kutzler were employees of Reuben Johnson & Sons ("RJS") or Chris Jensen & Sons, and whether they were working for Fraser on the *Jackson* project.  Fraser avers that no RJS employees were on the *Jackson*.

Regardless, Holder believed that he was working for Tradesmen, not Fraser. Moreover, the parties agree that Holder was paid by Tradesmen during the course of his work at the Fraser Shipyards, although they dispute whether Fraser provided Holder with tools or whether Holder brought his own, with the exception of heavy equipment which they agree was available at the job site.  The parties also dispute whether Fraser made available safety and protective equipment.  Holder contends that when he checked out equipment, he identified himself as a Tradesmen employee.

Fraser asserts that Holder worked on a different project unrelated to the repowering

project -- specifically, one replacing shell plates, which was covered by a different Interlake purchase order -- while Holder maintains that he worked on the repowering project. In either case, Holder maintains that he was exposed to lead during his work on the project. He also avers that: (1) a Fraser representative informed him respirators were optional; (2) no one told him about designated changing areas, to vacuum his clothing, or other preventive hygiene; (3) the respirator he used at work was not fit tested; and (4) on January 29, 2016, Farkas informed him that "there is no lead paint" (Holder Dep. (dkt. #85) 164:6-165:5). Holder does not recall speaking with anyone from Interlake while working on the *Jackson*.

### C. Work Performed on the *Jackson*

The goal of the contract between Interlake and Fraser Shipyards was to convert the *Jackson* from steam- to diesel-powered. For the price of $9,784,295, plus costs for equipment, the *Jackson* repowering project included the installation of new diesel engines, operating and main decks, propeller and blades, control room and console, and a tailshaft, plus related piping, electrical components and equipment. During the work, the propeller blades, rudder, hub, unloading diesel generators, and stack were removed; the propeller shaft cut; the main propulsion turbine, propulsion boilers, propulsion controls, and reduction gear were demolished; and the outer hull below the waterline had a 7-foot by 4-foot hole in it. The ship was unable to propel itself and was no longer watertight and or capable of floating while in dry dock. Holder himself testified about "holes all over the shell of the boat," such that it looked like "Swiss cheese," and there was "no way in the world that boat was going to float if you flooded the dry dock at that point." (Holder Dep.

(dkt. #85) 151:3-15.)

As a result, the *Jackson* was in dry dock from December 15, 2015 until May 31, 2016, and could not have been used for transport during this time. The *Jackson* entered a Fraser "graving" dry dock, such that it was out of water and did not have a captain in service onboard. Although this repowering project was supposed to take approximately six months, and actually took nine, the parties agree that it was typical for a Great Lakes ship to be out of use during at least a few of the winter months, when maintenance is routinely done.

The parties dispute who controlled the *Jackson* during this upgrade. Holder argues that the ship remained in Interlake's active control, while Interlake points to Fraser. They likewise dispute whether Interlake controlled the details of the work performed by Fraser. They also disagree whether there was crew aboard. Holder avers that Mike Wolny was working on the ship on behalf of Interlake, while Interlake responds that Wolny was a "field project manager," who updated Interlake on the status of the project, but did not reside on the ship and was provided office space by Fraser. Holder contends Wolny's presence practically gave Interlake the ability to intervene in the work being completed and to direct workers on how to do their jobs, while Interlake contends that Wolny was merely a "technical advisor," who advised about the positioning of valves. Interlake maintains further that it only had the right to approve and inspect work, material and workmanship, to assure conformance with the contract.

Still, the parties agree that Wolny met weekly with Fraser's Currelli and that Interlake needed to pre-approve additional work. Wolny also created "Weekly Repower

Reports" for Interlake's director of fleet projects, Ian Sharp, in which he regularly reported that Fraser "require[d] a procedure to deal with the discovery of lead paint" and that no testing for lead paint had been performed. (*See e.g.* Weekly Reports (dkt. #100-2) 27, 36, 64, 84.) According to plaintiff, Fraser relied on Grant Huttel, a Capstan employee, for safety management during the *Jackson* repowering project.

The ship was returned to Interlake on September 25, 2016, a Certificate of Inspection was issued on September 23, 2016, and an American Bureau of Shipping Certificate for the *Jackson* was issued on December 15, 2016. The parties dispute whether the *Jackson* needed these certificates before it could sail.

### D. Knowledge of Lead

The parties next dispute whether Fraser assumed the ship had lead paint based on its age, but Interlake expressly warned Fraser in the contract that "there may be asbestos and lead paint" on the ship *and* that the "responsibility to safely remove any and all asbestos and lead paint that is disturbed as a result of this conversion" fell to Fraser. (Shipbuilding Contract for the Re-Powering of the Str. Herbert C. Jackson and Attachments (dkt. #81-1) 43.) Moreover, a kick-off meeting between Fraser, Interlake, Seeley Electric, Toromont, MAST, Northern Engineering, Bay Engineering, Robinson Brothers, and Benson Electric was held on October 12-13, 2015, at which they discussed asbestos abatement. At that meeting, Interlake avers it again warned Fraser that lead paint was likely to be found on the *Jackson*, to which Fraser responded that it had a procedure for handling lead.

On November 30, 2015, Robinson Brothers gave Fraser a price quote on lead paint

removal from the engine room of the *Jackson*. Interlake contends that this quote addressed only a "localized spot," and such work was completed. Plaintiff alleges that Interlake chose not to repaint the engine room because the cost of removing and replacing the paint was too high and would take too long.

At a meeting on December 15, 2015, Interlake again informed Fraser that there likely was lead paint on the ship, this time pointing out that other shipyards working on the *Jackson* during prior winters had developed procedures for detecting lead paint and ensuring worker safety by monitoring air quality. Plaintiff disputes Interlake's assertion that Fraser's Tom Currelli assured that a system was in place for dealing with toxins, including lead paint, that was similar to other shipyards'.

Plaintiff further hypothesizes that Fraser's allegedly written, lead compliance program was only created after the *Jackson* project was terminated, disputing the assertion that Fraser informed Interlake at a January 8, 2016, meeting of its intent to activate its lead detection and remediation procedures. Plaintiff also disputes Interlake's assertion that it did not know Fraser had failed to act to protect workers from lead paint and other toxic substances.

### E. OSHA Investigation

Workers complained to defendants Capstan and Fraser about the air quality aboard the *Jackson*. When Capstan and Fraser did nothing, workers then turned to OSHA. OSHA conducted air sample testing on the *Jackson* on February 10-11, 2016, resulting in a citation and notice of penalty on July 29, 2016. (OSHA Citation (dkt. #101) 36.) On both days, OSHA found "[t]he employer did not ensure that employee(s) exposure to lead did not

exceed 40 micrograms per cubic meter (ug/m3) of air, as a reduced 10-hour time weighted average (TWA) for the extended work shift." (*Id.*)[8] Those violations occurred when an employee was welding in Ballast Tank #5. (*Id.*) On February 10th, the employee's exposure was approximately 11.66 times permissible exposure; on the 11th, the exposure was approximately 4.05 times permissible exposure. (*Id.*) OSHA conducted additional air sample testing on March 23, 2016, again finding lead exposures greater than the permissible level. (*See e.g. id.* at 39.) OSHA found several violations. (*See generally* OSHA Citation (dkt. #101).)

## F. Holder's Injury

After Holder stopped working on the *Jackson* on February 29, 2016, a former colleague advised him to have his blood tested because others had been exposed to lead. When Holder did so on April 1, 2016, his blood test revealed a blood-level of 36.5 μg/dL. In contrast, a normal blood lead level (BLL) for adults at that time was considered to be less than 5 μg/dL, with an average of 1.2 μg/dL. *See* The National Institute for Occupational Safety and Health (NIOSH) Adult Blood Lead Epidemiology and Surveillance (ABLES)

---

[8] Fraser disputes plaintiff's reliance on the subsequent citation based on these findings because Fraser entered an agreement with OSHA to resolve their disputes, which agreement and actions taken pursuant thereto were expressly not to be deemed admissions. Moreover, the parties to that agreement agreed that OSHA's findings could not be used for any purpose other than proceedings and matters arising under the Occupational Safety and Health Act of 1970. However, the plaintiff was not a party to that agreement, and regardless, the "findings" referred to in the agreement appear to refer to the findings referred to *within the agreement itself*, which amends the citations and notifications to include the agreement, not the other way around. (*See* OSHA Stipulation (dkt. #118-1) 4, 11.) Although some objection might be made to admission of the citation itself (or even OSHA's underlying findings) on foundation or hearsay grounds, the court will assume for purposes of summary judgment that plaintiff can clear that hurdle at trial, or at minimum an expert could rely on the citations in forming his own opinions.

Program Description, Centers for Disease Control and Prevention (Aug. 10, 2017), https://www.cdc.gov/niosh/topics/ables/description.html (hereinafter "NIOSH ABLES").[9]

Holder applied for benefits under the Act on January 9, 2017, identifying Tradesmen as his employer and Chris Pooler as his supervisor. (LHWCA Claim Form (dkt. #102-2) 1.)[10] The U.S. Department of Labor notified Tradesmen of the claim. Holder has yet to receive workers' compensation benefits from any defendant. Tradesmen is not covered by Fraser's LHWCA insurance. Likewise, Fraser's insurance policy covers neither Chris Jensen & Son Co. nor RJS Construction as a related or alternate employer.

Dr. David Parker, a licensed physician with a master's of public health in occupational epidemiology, who has consulted with labor and industry about worker health and safety, spoke with Holder on the phone and reviewed his medical records.[11] He also created and used an Adult Lead Survey to examine Holder's exposure during his work on the *Jackson*. Dr. Parker concluded that Holder had suffered from lead poisoning because of his work on the *Jackson*.

OPINION

Summary judgment is appropriate if the moving party establishes "that there is no

---

[9] Even if one considered the guidance for adults for 2009-2015, normal BLL was ≤10 µg/dL. *See* NIOSH ABLES.

[10] Defendants Fraser and Capstan point out that the claim form was not signed by Holder, but rather by Tommy Dulin, his attorney for his LHWCA claim.

[11] For purposes of summary judgment, Interlake does not challenge Dr. Parker's qualifications or analysis, but reserves the right to do so at trial. Although no such reservation was required, apparently discovery had not been taken regarding Dr. Parker when summary judgment was being briefed.

genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the district court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Disputes as to non-material facts will not preclude the grant of summary judgment. *See id.* at 247-48 ("By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). Moreover, the court must "view the facts in the light most favorable to the non-moving party," and draw "all reasonable inferences from those facts in [the non-moving party's] favor," but need not ignore facts unfavorable to the non-moving party because it only receives the benefit of the doubt if the record has evidence on both sides of a question. *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 366 (7th Cir. 1997) (citing *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). In the end, if a reasonable factfinder could not, based on the record as a whole, find for the non-moving party, summary judgment is appropriate. *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, Nos. 13-0366, 13-0550, 13-5137, 13-2496, 13-5508,13-6022, 13-6099, 13-6413, 14-374, 2014 WL 5113322, at *7 (E.D. La. Oct. 10, 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, (1986)). Here, there are simply too many material disputed issues of fact to grant summary judgment, at least as to some of the defendants.

The Longshoreman and Harbor Workers Compensation Act provides worker's compensation to employees for

> disability or death . . . if [such] results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading or unloading, repairing, or building a vessel).

33 U.S.C. § 903(a).  Injury includes "occupational disease or infection."  33 U.S.C. 902(2).

An employee is "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker."  33 U.S.C. § 902(3).  This requires a plaintiff to satisfy the situs and status tests discussed in the court's motion to dismiss.  *See Peter v. Hess Oil V.I. Corp.*, 903 F.2d 935, 938 (3d Cir. 1990), *reh'g denied*.  In turn, "an employer" under the Act includes:

> any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

33 U.S.C. § 902(4).

The Act's coverage was expanded in 1972 to include "adjoining area[s] customarily used by an employer in loading, unloading, dismantling, or building a vessel" to erase disparity between the benefits available to longshoremen injured on navigable waters and those injured on adjacent piers, with Congress seeking "to provide a seamless blanket of coverage for all longshore injuries."  *Peter*, 903 F.2d at 948.  Generally, the Act provides the *exclusive* remedies against employers and vessels, by barring other state tort remedies.  *See* 33 U.S.C. § 905(a)-(b); *see also Peter*, 903 F.2d at 951-52 ("[Plaintiff's] judgment based

on Virgin Islands' law is every bit as disruptive of Congress' *quid pro quo* as would be a negligence judgment based on federal maritime law. Accordingly, we do not find it surprising that the only court of appeals to have considered the issue has concluded that § 905(a) bars a state tort recovery from a LHWCA employer.").[12]

Just as most other workers compensation acts, however, the LHWCA does permit an injured employee to sue third parties. *See* 33 U.S.C. § 933(a), (i). The principal issue on summary judgment as to defendant Interlake, the *Jackson*'s owner, is whether it is subject to liability in this court under the Act as a "vessel," *or* under the general umbrella of a suable third party. As noted, plaintiff also brought claims against Fraser Shipyards, where the work on the *Jackson* was done, and Capstan, the owner and parent corporation of Fraser, which plaintiff now alleges was responsible for safety management for the work on the *Jackson*. The court will address the claims against each defendant in turn.

---

[12] On the question of exclusivity, *Peter* specifically held that "where an employer has obtained workmen's compensation coverage for its LHWCA employee under both LHWCA and the state or territorial statute, § 905(a) and the Supremacy Clause bar a state or territorial tort recovery against the employer." 903 F.2d at 953. A California appellate court, however, reads *Peter* more broadly: "Noting that Congress, in enacting the LHWCA, 'intended that compensation, not tort damages, were to be the primary source of relief for workplace injuries for longshoremen against their employers,' the federal Court of Appeal[s] for the Third Circuit held that the longshore worker's Virgin Islands common law tort action was barred because it obstructed the 'congressional policies advanced by the LHWCA.'" *Lenane v. Continental Maritime of San Diego*, 72 Cal. Rptr. 2d 121, 129 (Ct. App. 1998), *review denied*. Ultimately, the California court allowed an injured employee to pursue state workers' compensation because the LHWCA did not preempt the California state compensation scheme. Section 4558 permitted an employee to sue employer where his injury was allegedly caused by the employer's knowing removal of, or knowing failure to install a point of operation guard on a power press, which was an exception to the state workers compensation scheme. This appears to be a departure from other federal and state courts considering preemption under other state workers compensation laws. *See infra* Section I.B.1.

## I. Claims Against Interlake

### A. § 905(b) of the LHWCA

Section 905(b) of the Act allows the exclusive remedy for maritime torts to be asserted against "vessels," which include "said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charter, master, officer, or crew member." *See* 33 U.S.C. §§ 902(21), 905(b). Importantly, "[i]t is not a vessel owner's status as a vessel owner that dictates which LHWCA provision a maritime worker may use; it is the type of negligence that the worker alleges and the duty that is owed by the vessel owner that is controlling." *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 292 (5th Cir. 2008). In enacting § 905(b), "Congress did not create a new or broader cause of action in admiralty than that which previously existed, but rather it curtailed available third party tort actions." *Richendollar v. Diamond M Drilling Co.*, 819 F.2d 124, 125 (5th Cir. 1987). For a tort to be cognizable under this section, it "must occur on or in navigable waters subject . . . to the special provisions of the Admiralty Extension Act, and there must be the traditional admiralty nexus." *Id.* (footnotes omitted) (; *see also* Mot. Dismiss Op. (dkt. #59) 7-8). Thus, the court is faced with two questions: (1) does plaintiff have a maritime tort cause of action; and (2) was a breach of duty by Interlake the proximate cause of plaintiff's injury?

### 1. Maritime Tort

As the court explained in its opinion on the motion to dismiss,

> To prevail on a negligence claim against a "vessel" under § 905(b), a plaintiff must satisfy a two part test: "(1) his injury must occur within an area adjoining navigable waters of the

United States, known as the 'situs' test, *and* (2) the nature of
the work performed by him must be maritime in nature, known
as the 'status' test."

(Mot. Dismiss Op. (dkt. #59) 8 (quoting *McLaurin*, 529 F.3d at 289) (emphasis added).)

Interlake argues that the court's analysis begins and ends with the situs test because:

(1) the *Jackson* was in permanent dry dock, meaning Holder's injury occurred on land; and

(2) the *Jackson* was not a "vessel" at the time of Holder's injury. As such, the parties did

not address the status test.[13]

Turning first to Interlake's assertion that the situs of plaintiff's injury was on land

because the *Jackson* was in "dry dock," as plaintiff points out, that term is included within

the definition of "navigable waters" in § 903(a) itself. Indeed, a vessel in dry dock -- even

a so-called "graving" dry dock[14] -- has still been considered within navigable waters for

purposes of admiralty jurisdiction for over one hundred years. *See Vasquez*, 582 F.3d at

299 ("The water in a graving (or graven) dock is temporarily removed so that a ship under

repair comes to rest on dry land, but the temporary absence of water does not defeat federal

maritime jurisdiction." (citing *The Robert W. Parsons*, 191 U.S. 17, 33-34 (1903)); *see also*

*Sea Vessel Inc. v. Reyes*, 23 F.3d 345, 348-49 (11th Cir. 1994) (concluding that a ship in

dry dock is "in or on navigable waters for purposes of admiralty jurisdiction" based on

common practice, logic and Supreme Court precedent (citing *Robert W. Parsons*, 191 U.S.

---

[13] Undoubtedly, this is because the work performed by plaintiff appears to be maritime in nature.

[14] "A graving [dry] dock is 'a permanent structure on land with gates that allow vessels to enter and that then can be closed to drain out the water. In other words, it is a dry drydock." *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 298 (2d Cir. 2009) (quoting *San Francisco Drydock, Inc. v. Dalton*, 131 F.3d 776, 777 (9th Cir. 1997)).

at 33-34; *Simmons v. The Steamship Jefferson*, 215 U.S. 130, 142 (1909); *Gonsalves v. Morse Dry Dock & Repair Co.*, 266 U.S. 171 (1924)); *Cabasug v. Crane Co.*, 956 F. Supp. 2d 1178, 1178 & n.11 (D. Haw. 2013) (collecting cases). Thus, as a matter of settled law, the *Jackson* was within an area adjoining navigable waters -- and not on land -- while plaintiff was aboard.

As to the argument that the *Jackson* was no longer a vessel, however, Interlake has a better argument, albeit one that also does not warrant summary judgment. As an initial matter, a "vessel" incorporates "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 489 (2005) (quoting 18 Stat., pt. 1, p. 1).[15] This definition is the codification of the term's meaning in general maritime law. *Id.* at 490. In *Stewart*, the Supreme Court held that "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 494.[16] As such, "structures *may* lose their character as vessels if they have been withdrawn from the water for extended periods of time," *id.* at 496 (internal citations omitted) (emphasis added), unless as "a practical possibility or merely a theoretical one," the watercraft can be used

---

[15] The only change to this definition since 1873 was the removal of the hyphen in "water-craft" in the 1947 Rules of Construction Act. *See Stewart*, 543 U.S. at 489-90 & n.4; *see also* 1 U.S.C. § 3 ("Vessel" as including all means of water transportation).

[16] The *Stewart* Court explained that "[a] ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again." *Id.* at 496 (citations omitted).

"as a means of transportation on water." *Id.* Providing further guidance, the *Lozman* Court advised that a structure is not included in the definition of "vessel" "unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115, 121 (2013). The Court noted that "lack of self-propulsion is not dispositive," but "may be a relevant physical characteristic." *Id.* at 122 (citing *Parsons*, 191 U.S. at 31).

For purposes of this case, therefore, the relevant question is whether the work on the *Jackson* became significant enough that it was no longer "'capable of being used' for maritime transportation." *Stewart*, 543 U.S. at 496;[17] *see also West v. United States*, 361 U.S. 118, 122 (1959) ("It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury."); *Lozman*, 586 U.S. at 136 (Sotomayor, J., dissenting) ("[S]hips that 'have been withdrawn from the water for extended periods of time' in order to facilitate repairs and reconstruction may lose their status as vessels until they are rendered capable of maritime transport." (citing *Stewart*, 543 U.S. at 496)). This

---

[17] In *Stewart*, the Supreme Court noted

> that the "in navigation' requirement" [does not] st[and] apart from § 3, such that a "vessel" for purposes of § 3 might nevertheless not be a "vessel in navigation" for purposes of the Jones Act or the LHWCA. Instead, the "in navigation" requirement is an element of the vessel status of a watercraft. It is relevant to whether the craft is "used, or capable of being used" for maritime transportation.

*Stewart*, 543 U.S. at 496 (internal citation omitted).

will be a question for the jury.  *See Stewart*, 543 U.S. at 496 ("In some cases the inquiry ["whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one"] may involve factual issues for the jury[.]" (citing *Chandris*, 515 U.S. at 373)).

Regardless of whether Holder was working on the repowering project or another project, it is undisputed that the *Jackson* was undergoing major construction during the time that he was working.[18]  The project, costing $9,784,295 plus equipment, involved: (1) the removal of the propeller blades, rudder, hub, unloading diesel generators, and stack; (2) the demolition of the propeller shaft cut; the main propulsion turbine, propulsion boilers, propulsion controls, and reduction gear; and (3) the installation of new diesel engines, operating and main decks, propeller and blades, control room and console, and a tailshaft, as well as related piping, electrical components and equipment.  Further, for a time there was a 7-foot by 4-foot hole in the outer hull below the waterline.  Plaintiff himself described the ship as looking like "Swiss cheese," and acknowledged "holes all over the shell of the boat," and that there was "no way in the world that boat was going to float if you flooded the dry dock at that point."  (Holder Dep. (dkt. #85) 151:3-15.)  The ship was in dry dock for five and a half months and was out of service for nine months, instead of the predicted six, obviously longer than during  the typical annual winter repair.  For some period during

---

[18] The court does not view the dispute about whether plaintiff was working on the repowering project as material because the repowering project was ongoing when plaintiff was working on the *Jackson* such that the structure and capability of the *Jackson* was impacted thereby.  *See West*, 361 U.S. at 122 (explaining that the ship's status, extensiveness of contracted work, and pattern of repairs -- instead of the work being performed by individual shore-based workmen at the time of injury -- should be the focus).

this time, there was no "practical possibility" that it could have been used "as a means of transportation on water," *Stewart*, 543 U.S. at 496, in part because it was incapable of remaining afloat. *See Richendollar*, 819 F.2d at 126-27 (holding that rig was "not in or on navigable waters" and was not a "vessel" for § 905(b) where it "was positioned on blocks, on land, and was approximately 85% complete," with "holes in its hull" and "not capable of navigation").

However, that is not the end of the inquiry. First, the physical structure of the *Jackson* still indicated to any reasonable observer that it was *designed* for water transport. (*See* Photo of *Jackson* in Dry Dock (dkt. #81-2) 2; Photo of *Jackson* with Rudder Removed (dkt. #81-3) 2; Photo of *Jackson* Holes (dkt. #81-4) 2.) Second, it is unknown for *how long* the *Jackson* was practically incapable of maritime transport and how this amount of time related to plaintiff's work on the ship.

Plaintiff's proposed expert John Sullivan opined that "[t]he Jackson never stopped being a vessel while it was in the dry dock" because "[t]he work on [it] was not, in any way, comparable to a vessel being taken out of service and permanently moored to the shore or the ocean floor."[19] (Sullivan Aff. (dkt. #100) ¶¶ 17-18.) Sullivan based this on

---

[19] John Sullivan has licensing from the U.S. Coast Guard as a chief engineer of steam, motor and gas turbine powered vessels of any tonnage and unlimited horsepower. He is also an American Bureau of Shipping accredited marine surveyor. As with Dr. Parker, Interlake does not challenge the qualifications or analysis of Mr. Sullivan for purposes of summary judgment, but reserves the right to do so at trial because expert discovery had not been conducted before briefing for summary judgment. The court notes that plaintiff purported to "adopt[] by reference" "[t]he supporting reasons for each of [Sullivan's] opinions" as "set forth in Mr. Sullivan's affidavit." (Pl.'s PFOF (dkt. #99) ¶ 110.) The court considered Sullivan's affidavit, but such incorporation by cross-reference is not appropriate. (*See* Procedure to Be Followed on Motions for Summary Judgment (dkt. #35) 11 ("Each fact must be proposed in a separate, numbered paragraph, limited as nearly as possible to a single factual proposition.").)

the fact that the *Jackson* "was in the middle of its useful life [and was] being refurbished for the precise purpose of returning to service," which it eventually did. (*Id.* at ¶ 17.) As elaborated above, however, a comparison to being "permanently moored" is not the legal standard for whether a watercraft is a "vessel." Further, it is improper for an expert to offer opinions inconsistent with the appropriate legal standard. *See Wis. Res. Prot. Council v. Flambeau Mining Co.*, No. 11-cv-45-bbc, 2012 WL 12996210, at *2 (W.D. Wis. May 17, 2012) ("[E]xperts may not offer opinions about the applicable legal standards . . . . It is the court's job to determine the appropriate legal standards . . . ."). Even so, his other opinions may be useful -- or even persuasive -- to the jury. Thus it will be for the jury to determine whether the *Jackson* was a "vessel" at the time of plaintiff's lead exposure, which will determine the applicability of § 905(b).

## B. State Law Claims

### 1. Ability to Assert

In his summary judgment opposition, plaintiff argues that "§ 905(b) is not the *sine qua non* of Interlake's liability" because "if § 905(b) does not apply, then plaintiff is free to pursue state law claims against Interlake even though . . . not expressly included . . . in his complaint." (Pl.'s Opp'n (dkt. #98) 9, 10 n.1.) However, as Interlake notes, plaintiff appeared to disclaim possible state law claims against Interlake in his complaint. (Interlake Reply (dkt. #119) 2-3; *see also* 3d Am. Compl. (dkt. #106) ¶¶ 64-65; *compare id.* ¶ 65 ("The claims for relief against [Interlake] are expressly authorized by LHWCA § 905(b) and this statute makes clear that general admiralty and maritime law governs these claims.") *with id.* ¶ 66 ("The claims for relief against [Capstan and Fraser] are permitted by LHWCA

§ 933 and brought pursuant to general admiralty and maritime law, or alternatively general admiralty and maritime law supplemented by state law, or alternatively applicable state law.").)  Following the court's invitation to address Interlake's waiver argument, plaintiff responded that

> Over fourteen months ago, in response to Interlake's motion to dismiss, counsel for the plaintiff stated in a footnote: "If for any reason the Court disagrees [with plaintiff's argument LHWCA Section 905(b) governs plaintiff's claims against Interlake], plaintiff moves for leave to file a second amended complaint, in order to state claims for relief against Interlake and others under state law."

(Pl.'s Sur-Reply (dkt. #136) 1 (quoting Pl.'s Mot. Dismiss Opp'n (dkt. #32) 7 n.1).)

Thus, plaintiff argues "it cannot be a surprise to Interlake" that he "will seek leave to amend the complaint" if the court concludes that § 905(b) does not apply.  (*Id.* at 2.)  He adds that the "plain language" of Paragraphs 64 and 65 of his complaint "belie" Interlake's argument that plaintiff disclaimed reliance on state law.  (*Id.*)

Plaintiff is correct that he did not need to "plead legal theories in [his] complaint." *King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014).  However, that is not the end of the inquiry.  *King* itself recognizes that (1) district courts have "discretion to narrow and focus the operative legal issues as the trial date closes in," *id.* (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008)); and (2) "[a] party's attempted jump-shift in legal theory on the brink of trial is certainly not a vested right," *id.* at 647.[20]  This is especially true here

---

[20] Further, *King* is distinguishable.  *King* involved the risk of "grave inequity" caused by application of the incorrect legal standard, despite "all parties and the court [being] aware of the correct standard."  *King*, 763 F.3d at 644.  *King* concluded that "delay should [not] have been the sole factor considered, or the weightiest."  *Id.* at 645.

where plaintiff ignored the court's invitation to "advise[]" if he was "pressing his state law claims," despite filing two amended complaints since then. (MTD Opinion (dkt. #59) 24 n.14 ("Having now denied Fraser and Northern's motion to dismiss, the court assumes that plaintiff is not pressing his state law claims, if any, going forward, unless advised otherwise.").) The court notes that its invitation post-dated plaintiff's footnote and that it was incumbent on plaintiff to accept in a timely manner. *See GQ Sand, LLC v. Conley Bulk Servs.*, No. 15-cv-152-wmc, 2016 U.S. Dist. LEXIS 75149, at *3 (W.D. Wis. June 9, 2016) ("While plaintiff should have sought leave to amend at least contemporaneous with its January filing for summary judgment, . . . insertion of these claims at summary judgment at least gave defendants notice of [plaintiff's] intent to pursue them, ameliorating some of the prejudice [plaintiff's] delay in seeking a formal amendment of its complaint may have caused.").

The court will, however, consider this belated assertion of state law claims as a motion to amend his complaint under Rule 15(a)(2), which provides that leave should be "freely given . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). As noted at the motion to dismiss stage, that does not require leave always be given: "district courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile[.]" *See Arreola v. Gonzalez*, 546 F.3d 788, 796 (7th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Wis. Bell, Inc. v. McImetro Access Transmission Servs.*, 218 F.R.D. 616, 618 (E.D. Wis. 2002) (a plaintiff who pleads legal theories is limited to the theories expressly referenced "if injecting a new legal theory

into the case would prejudice the defendant, the plaintiff may be limited to those theories expressly named in the complaint." (citing *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1998))).[21]

Defendant's sole argument is that plaintiff waived or disclaimed his state law claims. Importantly, plaintiff is only able to assert his state claims if § 905(b) does not apply. *See McLaurin*, 529 F.3d at 293 ("If a maritime worker recovers against a vessel under § 905(b), then he may not also sue the vessel in tort," but if he cannot recover from the vessel's owner for failure to state a claim under § 905(b), that provision "does not preempt [his] state-law claim against [the vessel's owner] as a third-party tortfeasor. The plain language of § 933 clearly contemplates and preserves a maritime worker's ability to pursue separate claims against third parties, including vessel owners allegedly responsible for the injury."); *see Lee v. Astoria Generating Co.*, 13 N.Y.3d 382, 390-92 (Ct. App. 2009) (explaining that "whether section 905(b) applies in this case hinges upon whether the structure upon which plaintiff was injured is a vessel"; finding the barge was a vessel, the court noted that Congress's intent to preempt was "clear[]" and that plaintiff's state labor law claims against the vessel were preempted under §905(b)); *see also In re Donjon Marine Co.*, 2008 A.M.C. 2045, 2049-50, 2052 (S.D.N.Y. 2008) (applying *McLaurin* where plaintiff met the situs

---

[21] "Prejudice exists where the new theory would surprise the defendant because the complaint 'explicitly or implicitly disclaims' the theory or where the parties have 'tacitly' agreed not [to] pursue the theory and raising it would unreasonably delay the litigation." *Wis. Bell,* 218 F.R.D. at 618 (quoting *Vidimos*, 99 F.3d at 222). In *Bell*, however, the district court did not find prejudice because: the complaint allegations presented a state contract claim; plaintiff had not disclaimed state claims, the parties had no agreement to address such claims; and the Supreme Court case on which the defendants relied contemplated pursuit of state law claims following resolution of the federal claims. *Id.*

and status requirements, but "failed to adduce facts that would permit a reasonable fact finder to determine that his injury resulted from [the vessel's] negligence).

Could the plaintiff have avoided this uncertainty by pleading his state and federal claims as alternatives?  Certainly, but this failing does not doom his ability to claim both. Plaintiff argues that "there will be no delay at all and the case will not be any more costly or difficult to defend" because "the same witnesses will testify and the same exhibits will be offered and received" and the "fundamental factual allegations are the same" regardless of if "plaintiff's legal right of action is based on federal or state law."  (Pl.'s Sur-Reply (dkt. #136) 5, 4.)  The court agrees that because plaintiff's state law claims arise from the same facts and rely on the evidence, Interlake should not be meaningfully prejudiced by this addition.  Thus, the court again will grant plaintiff's implicit request to amend the complaint, though for the *last* time.

### 2.  Asserted Claims

Plaintiff purports to raise a negligence claim under the Wisconsin Safe-Place Statute.[22]  To establish a common law negligence claim, a plaintiff must establish: (1) a duty of care, (2) a breach of duty, and (3) injury (4) caused by the breach.  *Kaltenbrun v. City of Port Wash.*, 156 Wis.2d 634, 641, 459 N.W.2d 259 (Ct. App. 1990) (citing *Johnson*

---

[22] Plaintiff denotes his state law claim as two claims: one under common law negligence and one under the Wisconsin Safe-Place Statute.  However, "the Safe Place Statute does not create a cause of action.  'It merely lays down a standard of care and if those to whom it applies violate the provisions thereof they are negligent.'"  *Krause v. Veterans of Foreign Wars, Post*, 9 Wis.2d 547, 552, 101 N.W. 2d 645 (1960) (quoting *Ermis v. Fed'l Windows Mfg. Co.*, 7 Wis.2d 549, 555, 97 N.W.2d 485 (1959)).  "It is the violation of the Safe Place Statute which constitutes negligence on the part of an owner of a place of employment.  In this respect such statute does not differ from any other safety statute which imposes a duty to exercise a certain prescribed type of care . . . ."  *Id.*

*v. Seipel*, 152 Wis.2d 636, 643, 449 N.W.2d 66 (Ct. App. 1989)). "Duty is the exercise of reasonable care whenever it is foreseeable that one's conduct may cause harm to another." *Id.* (citing *Johnson*, 152 Wis.2d at 68). "This rule applies even though the nature of that harm and the identity of the harmed person may be unknown at the time of the act." *Id.* (citing *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis.2d 479, 483, 214 N.W.2d 764 (1974)). It is possible, however, for a party to discharge its duty "by turning the project over to a responsible independent contractor possessing the necessary knowledge and expertise who can *safely* perform the project," such that "an owner who has contracted with a reliable and qualified independent contractor to implement all safety precautions associated with the work has fulfilled its duty of reasonable care to those employees of the general contractor or those employed by subcontractors whom the general contractor has hired." *Id.* at 643. Yet, "a contract does not automatically insulate an owner from liability," if, for example the owner "fails to scrutinize the independent contractor's credentials prior to contracting." *Id.*[23]

Wisconsin's Safe-Place Statute requires all employers provide a "safe" "place of employment" "for employees therein and for frequenters thereof," as well as all employers and owners of "place[s] of employment . . . construct, repair or maintain such place[s] . . . as to render the same safe." Wis. Stat. § 101.11(1). The statute also requires employers provide "safety devices and safeguards . . . reasonably adequate to render such employment

---

[23] "Generally, a principal employer is only liable in tort for injuries sustained by an independent contractor's employee while he is performing the contracted work if (1) the owner commits an affirmative act of negligence, or (2) the employee was injured while engaged in an extrahazardous activity." *Anderson v. Proctor & Gamble Paper Prod. Co.*, 924 F. Supp. 2d 996, 1001 (E.D. Wis. 2013) (internal citations omitted).

. . . safe." *Id.* Basically, it "protects against unsafe "'structural defects,'" as well as "unsafe 'conditions associated with the structure' of a building." *Viola v. Wis. Elec. Power Co.*, 2014 WI App 5, ¶ 18, 842 N.W.2d 515 (Ct. App. 2013) (quoting *Anderson*, 924 F. Supp. 2d at 1002).

Employees of an independent contractor working on the property qualify as "frequenters" under the statute. *Neitzke v. Kraft-Phenix Dairies, Inc.*, 214 Wis. 441, 253 N.W. 579 (1934) (citing *Sandeen v. Willow River Power Co.*, 214 Wis. 166, 252 N.W. 706 (1934)). The premises need only be kept "as safe as the nature of employment and the place of employment will reasonably permit." *Hrabak v. Madison Gas & Elec. Co.*, 240 F.2d 472, 475 (7th Cir. 1957). Still, this imposes a higher duty of care than required under common law negligence. *Couillard v. Van Ess*, 141 Wis.2d 459, 464, 415 N.W.2d 554 (Ct. App. 1987). Yet,

> when the employer knows that a dangerous instrumentality which he has located in the "place to work" is to be brought within the range of the operation to be engaged in by those properly on the premises, he is liable for failure to reduce to a minimum the possibility of danger from that instrumentality.
>
> A reasonable interpretation of the statute as it applies to frequenters, is that the employer's duty is to make the premises safe for the performance of acts which he knows or reasonably should know are going to be performed thereon.

*Neitzke*, 253 N.W. at 581-82.

The statute differentiates between "hazardous condition[s] result[ing] from an unsafe condition associated with the structure" and "reckless or negligent acts of persons on the premises." *Viola*, 2014 WI App 5 at ¶ 18 (internal citations and quotation marks omitted). The former fall within the statutory reach, while the latter do not under the

27

"acts of operation rule." *Id.* The "acts of operation rule" is inapplicable where the dangerous condition is caused by disturbing a toxic substance "as part of the maintenance and/or repair work required at the premises." *Id.* at ¶ 24 (internal citations omitted).[24] An owner must have actual or constructive knowledge of the defect "[w]here the hazardous condition results from an unsafe condition associated with the structure." *Anderson*, 924 F. Supp. 2d at 1002. When the "condition has existed a long enough time for a reasonably vigilant owner to discover and repair it," the owner had constructive notice. *Id.* at 1003 (quoting *Megal v. Green Bay Area Visitor & Convention Bureau, Inc.*, 2004 WI 98 ¶ 12).

Adequate notice is typically a question for the jury. *Id.* (citing *Gulbrandsen v. H & D, Inc.*, 2009 WI App. 138 ¶ 14). Warning an independent contractor of the danger is insufficient. *See Neitzke*, 253 N.W. at 582 ("When appellant neglected to perform his duty to a frequenter, under the circumstances of this case, of providing a safe place to work, he

---

[24] The court in *Viola* concluded that summary judgment for defendant was improper because:

> Viola's amended complaint does allege an "unsafe condition." The amended complaint alleges that Viola worked in premises where pipes were covered with asbestos-containing insulations. The regular maintenance and/or repair of the premises required that the asbestos be disturbed. The asbestos was disturbed -- in some instances by the decedent while performing work in the usual way as required by the decedent's employer and/or Wisconsin Electric. There is no evidence that Viola performed any of this necessary maintenance or repair work negligently. Furthermore, Wisconsin Electric knew about the asbestos and its health hazards, but failed to protect Viola from these hazards. Finally, Viola died from mesothelioma caused by his asbestos exposure. Given these facts, we conclude that the presence of asbestos dust in the air at Wisconsin's Electric's premises was an "unsafe condition" and that Viola's amended complaint properly alleges a negligence claim asserting Wisconsin Electric's violation of the Safe Place statute.

*Viola*, 2014 WI App at ¶ 25.

28

became liable for injuries resulting, and cannot avoid liability because he warned parties other than the respondent himself. The fact, if such be the case, that respondent's immediate employer was derelict in his duty does not affect the validity of respondent's claim against the appellant on whom rested the duty to provide a safe place to work.").

Under the Safe-Place statute, a "duty is imposed upon an owner only when there is retention of a right of control beyond mere legal ownership or right of inspection." *Kaltenbrun*, 156 Wis.2d at 646 (citing *Couillard*, 141 Wis.2d at 463). Where an owner *only* retains the right to inspect, it has no duty under the safe-place statute. *Id.*; *see also Hrabak*, 240 F.2d at 477 ("The rule in Wisconsin is that the owner or occupant is absolved of his duty only if he relinquishes complete control of the premises to the contractor and that the premises are then in a safe condition." (internal citations omitted)); *Anderson*, 924 F. Supp. 2d at 1004 ("The owner must have control over the place such that it can carry out its duty to furnish a safe place of employment, but the 'control and custody of the premises need not be exclusive, nor is it necessary to have control for all purposes.'" (quoting *Schwenn v. Loraine Hotel Co.*, 14 Wis.2d 601, 607, 111 N.W.2d 495 (1961))).

Ownership "is determined by factors such as possession, control, dominion and supervision." *Kaltenbrun*, 156 Wis.2d at 646 (citing *Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.*, 84 Wis.2d 1, 9, 267 N.W.2d 13 (1978)). Control is a question for the jury. *See Lee v. Junkans*, 18 Wis.2d 56, 61, 117 N.W.2d 614 (1962) ("The trial court instructed the jurors that it was their duty to determine if Mr. Junkans retained control of his premises."). Likewise, an owner may avoid liability in

> [s]ituations . . . where the premises are so changed by the independent contractor as to excuse the owner from liability.

> If, for instance, the dangerous instrumentality is erected by the independent contractor himself, or a defective scaffolding is installed, the owner may not be liable for the injuries resulting. Or, if the independent contractor conducts his work, unknown to the owner, in a manner so unusual and at variance with the customary methods of doing that work, that because of it an existing instrumentality becomes dangerous and renders the premises unsafe, the owner may be free from liability.

*Neitzke*, 253 N.W. at 582 (choke coils existing when independent contractor began work were harmless to appellant's employees because of their elevation, but "became a real and immediate danger when work was inaugurated which placed the coils in the probable line of operation").

Because the facts concerning control of the *Jackson* while plaintiff worked on it are in dispute, summary judgment is not appropriate on any state law claim. Plaintiff alleges that Interlake's representative Mike Wolny practically gave Interlake the ability to intervene in the work being completed and actually did direct workers about how to do their jobs. Interlake contends that it only had the right to inspect material and workmanship, it required to approve work and materials that conformed to the contract, and Wolny was a technical advisor who advised about the positioning of valves. Likewise, Interlake posits that Fraser had active control. Therefore, plaintiff will be able to proceed on his late-asserted state law negligence claim.

## C. Liability

Finally, defendant Interlake contends that it is not liable regardless of whether the standard under § 905(b) of the Act or Wisconsin negligence law applies. The Seventh Circuit described the *Scindia* duties owed by a shipowner under § 905(b) as follows:

First, when a shipowner turns a ship over to the stevedore, the shipowner must exercise ordinary care to have the ship and its equipment in a reasonably safe condition and must "warn[ ] the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it, that would likely be encountered by the stevedore . . . and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Scindia* [*Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 167 (1981)]. Second, a shipowner may be liable if it actively involves itself in the operations of the stevedore or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation. Lastly, even if the shipowner is not actively involved in operations and does not have active control of the vessel, if the shipowner has actual knowledge of a dangerous condition which has arisen after the turning over of the ship to the stevedore, the shipowner has a duty to intervene, under certain circumstances . . . to correct the dangerous condition.

*Elberg v. Mobil Oil Corp.*, 967 F.2d 1146, 1150 (7th Cir. 1992).[25] Breaches of these duties are only actionable if they are the "legal cause" of the injury. *In re Knudsen*, 710 F. Supp. 2d 1252, 1269 (S.D. Ala. 2010) (citing *Moore v. M/V Angela*, 353 F.3d 376, 383 (5th Cir. 2003)); Thomas J. Schoenbaum, 1 Admiralty & Mar. Law § 7-10 (5th ed) (To recover against a vessel on a § 905(b) claim, a plaintiff "must show (1) that the vessel had a duty to protect against the hazard; (2) breach of that duty; (3) injury and (4) that the injuries were proximately caused by the negligence of a vessel.").

As to the first so-called "turnover duty," a shipowner has two responsibilities:

(1) a duty to exercise ordinary care under the circumstances to

---

[25] Described in terms of duties owed to stevedores, these same duties should likewise apply to other independent contractors and harborworker employees, unless the danger is inherent in the activity itself. *See Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1326 (5th Cir. 1985) (quoting *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982)).

> turnover the ship and its equipment in such a condition that a
> competent contractor/repair yard can carry on its operations
> with reasonable safety; and (2) a duty to warn the contractor
> of latent or hidden dangers which are known to the vessel or
> should be known to it.

*Knudsen*, 710 F. Supp. 2d at 1273-74 (citing *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S.

92, 99-100 (1994)). A shipowner need not warn about dangers that a reasonably

competent contractor should anticipate or those that are open and obvious. *Id.* at 1274.

At summary judgment, plaintiff does not even argue that Interlake breached the turnover

duty (*see* Pl.'s Opp'n (dkt. #98) at 13-21), so the court will not discuss this duty further.

As to the second duty, a shipowner lacks a duty of active control where it lacks

control over both the vessel and the repairs being performed. *West v. United States*, 361

U.S. 118, 123 (1959); *see also Knudsen*, 710 F. Supp. 2d at 1271 ("[T]o give rise to liability

under the active control duty, such control may be over (1) physical areas on or near the

ship; (2) equipment; or (3) the work of independent contractors as long as such control is

over the actual methods of work used by the independent contractor and the operative

details."). Here, this duty turns on the scope of Mike Wolny's responsibilities and actions,

which is a material fact in dispute. *Cf.*, *West*, 361 U.S. at 123 ("Although some of

respondent's employees were on board the ship here, this would not attach liability since

they gave no orders, and did not participate in the work or supervise its progress, but were

simply inspectors or observers."); *see also Knudsen*, 710 F. Supp. 2d at 1270 (finding "a

genuine dispute of material facts as to whether the crew's involvement constituted

negligent behavior that proximately caused [plaintiff's] accident.").

Finally, as to the third duty to intervene, the Seventh Circuit explained in *Elberg*

that it is not enough for the shipowner to have actual knowledge of a dangerous condition, rather it must have actual knowledge of the unsafe condition and the contractor permitting the condition to continue, where the decision to not correct the unsafe condition is "obviously improvident." 967 F.2d at 1150 (quoting *Scindia*, 451 U.S. at 176).[26] Thus, Interlake's duty, if any, turns on whether it knew both of the dangerous condition of the lead paint and whether Fraser acted in an obviously improvident manner in handling the lead paint. Since there is a material factual dispute as to both, this claimed breach of duty cannot be resolved on summary judgment.

## II. Claim Against Fraser

Plaintiff also brings a negligence claim against Fraser under § 933 of the Act. (3d Am. Compl. (dkt. #106) ¶ 66.) Fraser argues that Holder was its "borrowed employee" when he was injured, and as such, § 933 is unavailable because the LHWCA limits employer liability to compensation under § 904. (*See* Fraser & Northern's Summ. J. Br. (dkt. #51) 19.) Under the LHWCA, worker's compensation is the only remedy available to an injured employee against his employer. *See* 33 U.S.C. § 905(a); *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1243 (5th Cir. 1988) *amended by reh'g denied*, 841 F.2d 572. This exclusivity also applies to an injured employee's borrowing employer. *Melancon*, 834 F.2d at 1243.

---

[26] The Seventh Circuit in *Elberg* agreed with the district court's conclusion that Mobil could reasonably rely on the contractor to correct any dangerous situations and that the contractor's decision to leave the tanks open without barricades during work was not "obviously improvident." Mobil had no duty to intervene.

The borrowed employee (or borrowed servant) doctrine provides that "an employee directed or permitted by his employer to perform services for another principal may become the employee -- i.e., the 'borrowed servant' -- of the borrowing principal in performing those services." *Langfitt v. Federal Marine Terminals, Inc.*, 647 F.3d 1116, 1122 (11th Cir. 2011). While originally applied in tort, this doctrine is relevant to workers' compensation to assess whether the employee was a borrowed employee when injured. *Id.* at 1123-24. If so, the borrowing employer is deemed an "employer" under the LHWCA. *Id.* at 1124.

Plaintiff and Interlake argue that "a contractor (such as Fraser) is not the LHWCA employer of a subcontractor's (i.e., [Tradesmen]) employees unless the subcontractor (Tradesm[e]n) failed to secure payment of LHWCA benefits and the contractor (Fraser) stepped in to fill the gap." (Interlake's Resp. to Fraser's Summ. J. Mot. (dkt. #92) 3; *see also* Pl.'s Opp'n (dkt. #98) 46-47 ("Fraser Shipyards would only be the employer of the plaintiff if [Tradesmen] failed to secure payment of LHWCA benefits to the plaintiff, **and** Fraser Shipyards stepped in and paid those benefits to the plaintiff." (emphasis in original)).) They base their argument on the following provisions:

- Section 904(a): "only if such subcontractor fails to secure the payment of compensation shall the contractor be liable for and be required to secure the payment of compensation." 33 U.S.C. § 904(a).

- Section 905(a): "a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 904 of this title." 33 U.S.C. § 905(a).

As pointed out by Fraser, however, this argument has been addressed and rejected by other courts on the ground that the 1984 amendment to § 905(a) did not eliminate the borrowed employee doctrine. *E.g.*, *Melancon*, 834 F.2d at 1246-47 (rejecting argument that

1984 amendments prevented application of the "borrowed employee doctrine" unless plaintiff's nominal employer failed to pay his LHWCA claim and the borrowing employer stepped in; recognizing other courts' rejections of this argument based on congressional intent (citing *West v. Kerr-McGee Corp.*, 765 F.2d 526 (5th Cir. 1985)); *Langfitt*, 647 F.3d at 1135 n.47 (refusing to consider this argument raised for the first time on appeal and noting that "[t]he Third and Fifth Circuits have given full consideration to this preemption argument, however, and both have rejected it."). As the Third Circuit explained,

> [T]here is nothing in the legislative history indicating that Congress intended to do anything other than overrule *Washington Metro*[*politan Transit Authority v. Johnson*, 467 U.S. 925 (1984) (holding a contractor who purchased LHWCA coverage for its subcontractors' employees could be considered those employees' employer under § 905(a))]. That brief history does not support the proposition that Congress wished to upset the use of the borrowed servant doctrine as utilized by the Fourth and Fifth Circuit cases.

*Peter v. Hess Oil V.I. Corp.*, 903 F.2d 935, 940-41 (3d Cir. 1990) (internal citation omitted), *reh'g denied*; *see also Melancon*, 834 F.2d at 1247 n.16 ("The legislative history of the 1984 amendments unambiguously demonstrates that Congress's sole purpose in amending § 904(a) and § 905(a) was to overrule [*Wash. Metro. Area Trans. Authority v. Johnson*], and not to amend the borrowed-servant doctrine or otherwise modify LHWCA law." (quoting *West*, 765 F.2d at 530)). This court likewise rejects this argument and proceeds to consider whether the borrowed employee doctrine applies.

Based on the court's decision on defendants' motions to dismiss (*see* dkt. #59 at 21-22), the parties understandably focus on the nine factors enumerated in *Capps*, 784 F.2d at 616-17 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir. 1969)):

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
(2) Whose work is being performed?
(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
(4) Did the employee acquiesce in the new work situation?
(5) Did the original employer terminate his relationship with the employee?
(6) Who furnished tools and place for performance?
(7) Was the new employment over a considerable length of time?
(8) Who had the right to discharge the employee?
(9) Who had the obligation to pay the employee?

The court will use this same framework.

No one factor is determinative, but control is the most important. *Id.* at 617. Because of the statutory scheme creating no-fault compensation as the only remedy for injured employees from employers, the borrowed employee doctrine requires consideration not just of who controlled the employee's work, but whether the employee consented to the borrowed employee situation. *Langfitt*, 647 F.3d at 1125-26 ("It plainly would be unfair . . . to bar an employee from bringing tort actions against a negligent principal when the employee did not have an opportunity to evaluate the risks posed by the new employment and to assume them consciously."). Whether the borrowed employee doctrine applies is question of law. *Capps*, 784 F.2d at 617. But factual disputes under each of the factors may still need to be submitted to the factfinder. *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, Nos. 13-0366, 13-0550, 13-5137, 13-2496, 13-5508,13-6022, 13-6099, 13-6413, 14-374, 2014 WL 5113322, at *9 (E.D. La. Oct. 10, 2014). The court considers each of these factors in turn.

### 1. Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

Importantly, the question is whether Fraser Shipyards "had assumed the *right* to control [plaintiff's] longshoring work." *Langfitt*, 647 F.3d at 1134. "Even if the details of the employee's work are actually controlled by someone other than the employer -- i.e., someone who did not have the right to exercise that control -- that does not supersede the existing employment relationship; the employer with the right to control remains the employee's LHWCA employer." *Id.*[27]

While the parties agree that the terms of the agreement specified that Fraser would be "solely responsible for directing, supervising and controlling Tradesmen employees, as well as their work" (Client Services Agreement (dkt. #15-1) ¶ 3(a)), Holder disputes that this was followed in practice and argues that his direct supervisors, Kutzler and Duncan, were employees of RJS Construction, so that Fraser did not control his work. In response, Fraser points out that: (1) RJS did not work on the *Jackson* while Holder was working on the ship; (2) Holder's supervisors were CJS employees; (3) Fraser relied on CJS to provide needed additional labor; (4) Holder was assigned his work by a Fraser foreman before Kutzler sought assistance; (5) Holder worked on a team comprised of workers from Fraser, CJS and Tradesmen, with supervision from Fraser; and (6) Fraser supervised Holder's CJS supervisor, who was also a borrowed employee. (*See* Fraser Reply (dkt. #112) 7-9.)

---

[27] The court in *Langfitt* makes this statement in addressing plaintiff's argument that facts were disputed as to whether FMT or BBC exercised control over him. The court then went on to find that FMT had exercised control over him and that it didn't matter that BBC had directed FMT's employee who supervised plaintiff.

Accordingly, which party had control over plaintiff is at least arguably "an undetermined factual issue" on this record, although leaning toward Fraser. *Barrios v. Freeport-McMoran Res. Partners Ltd.*, Civ. A. Nos. 93-0092, 93-0425, 1994 WL 90456, at *2 (E.D. La. Mar. 11, 1994) (finding factual dispute on control factor because plaintiff worked with personnel from his original and new employers and contractors working for his borrowing employer; received his orders from crane operators, who received direction from plaintiff's borrowing employer, working either for his original employer or a different contractor; and it was unclear if the borrowing employer's direction would trump the lending employer's).

This factual dispute need not be the end of the court's analysis. As the district court concluded in *Tajonera*, 2014 WL 5113322, at *10, "the factual determination of who controlled [plaintiff's] work should be decided by the fact-finder *unless* the other facts overwhelmingly support [plaintiff's] borrowed employee status."[28]

### 2. Whose work is being performed?

Under this factor the question is whose business did *Holder's* work further? *See Capps*, 784 F.2d at 617. Because Tradesmen's business involved providing skilled employees to other companies, Holder was not performing work for Tradesmen, at least not directly. *See Barrios*, 1994 WL 90456, at *2 ("[T]he providing of workers to further the business of the borrowing employer means that the worker is in fact performing the

---

[28] In fairness, the *Tajonera* court arguably asked a different question: whether the lending or borrowing employer controlled plaintiff's work, not whether the borrowing employer or a third-party controlled plaintiff's work. In *Tajonera*, the parties argued that the express contract governing the lending employer's provision of labor had been modified by the reality of the worksite, creating a dispute of material fact.

work of the borrowing employer."). Accordingly, the question is whether he was performing work for Fraser or for the employer of Duncan and Kutzler.

The dispute over whether Duncan and Kutzler were employees of CJS or RJS is immaterial. Regardless of who legally employed plaintiff's supervisors, Holder's supervisors were directed by Fraser and doing work for its benefit. Certainly, Holder offers no evidence to support any other inference. The ship was still at Fraser's shipyard and the work -- whether part of the *Jackson* repowering project or requested under a separate work order -- was performed on Fraser's behalf. (*See* Duncan Aff. (dkt. #124-1) ¶ 6 ("It was my understanding that RJS Construction Group, LLC had been hired as a subcontractor to Fraser Shipyards in order to provide construction foremen to supervise work on the Herbert C. Jackson.").) Therefore, this factor weighs in favor of borrowed employee status.

### 3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

There is no dispute that since February 2011, Fraser and Tradesmen had a written agreement under which Tradesmen would provide workers to Fraser, and Fraser would be "solely responsible for directing, supervising and controlling Tradesmen employees as well as their work." (Client Services Agreement (dkt. #15-1) ¶ 3(a).) This agreement also details that Fraser had the right "in its sole discretion, [to] release a Tradesmen employee back to Tradesmen at any time." (*Id.*) Plaintiff's complaint that there was no explicit language about borrowing employees is unfounded. This factor weighs strongly in favor of borrowed employee status.

### 4.  Did the employee acquiesce in the new work situation?

While Holder argues that he believed himself to be, and held himself out to be, an employee of Tradesmen while working on the *Jackson*, the question of employee acquiescence is an objective one.  *See Langfitt*, 647 F.3d at 1126 ("[R]egardless of the employee's subjective intent, consent may be gleaned from the employee's conduct and the nature of the employee's relationship with the borrowing principal.").  Basically, this factor asks "whether [plaintiff] had an opportunity to observe the conditions under which he was working and whether, after such an opportunity, he chose to continue working." *Barrios*, 1994 WL 90456, at *4.  As an employee of Tradesmen, a company that provided skilled labor to other companies, plaintiff certainly acquiesced to working for Fraser or at least under its direction.  *See Langfitt*, 647 F.3d at 1132 ("[C]onsent may be implied from the employee's conduct and the nature of his relationship with the borrowing principal.  . . . [T]hrough his employment with Able Body, a labor broker, [plaintiff] knowingly agreed to going to new work situations on a regular basis, including FMT's longshoring project." (internal quotation omitted)).  Again, this factor also weighs in favor.

### 5.  Did the original employer terminate his relationship with the employee?

This factor does not require the complete and utter severance of the relationship between the lending employer and the lent employee.  Indeed, such a requirement would moot the borrowed employee doctrine altogether, since the employee would have become the borrowing employer's employee. *Capps*, 784 F.2d at 617.  Instead, the focus is on the relationship the lending employer had with the employee while he was on loan.  *Id.* at 618.  Where the relationship between the employee and his original employer is "nominal at

best," this factor weighs in favor of borrowed employee status. *Melancon*, 834 F.2d at 1246. Here, plaintiff fails to articulate any meaningful control that Tradesmen had over him during his work at the Fraser Shipyard, other than withholding pay or firing him from his Tradesmen employment. So, this factor also weighs in favor of the doctrine's application.

### 6. Who furnished tools and place for performance?

The parties agree that Holder brought some of his own tools, but that heavy equipment was available at the jobsite for his use. The parties also agree that the jobsite -- the *Jackson* -- was set in Fraser's dry dock. As such, this factor at least "leans" towards borrowed employee status. *See In re Knudsen*, 710 F. Supp. 2d 1252, 1267 (S.D. Ala. 2010).

### 7. Was the new employment over a considerable length of time?

"[W]here the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the converse is not true." *Capps*, 784 F.2d at 618. Just shy of two months is not a "considerable" amount of time, but neither is it inconsiderable, particularly considering the alleged impact of his exposure to lead. This factor is neutral. *Compare Knudsen*, 710 F. Supp. 2d at (finding two-week employment to be neutral) *with Barrios*, 1994 WL 90456, at *4 (finding employment of five months to "sufficient . . . to create an expectation of continued employment," "weigh[ing] in favor of borrowed employee status").

### 8. Who had the right to discharge the employee?

The question here is who had the power to fire Holder from his *work with Fraser*, not who could fire him from his employment with Tradesmen. *See Capps*, 784 F.2d at 618;

*Barrios*, 1994 WL 90456, at \*4. There is no dispute that the agreement between Tradesmen and Fraser gave Fraser the right "in its sole discretion, [to] release a Tradesmen employee back to Tradesmen at any time." (Client Services Agreement (dkt. #15-1) ¶ 3(a).) Holder's argument about signing a document permitting himself or Tradesmen to end his employment *with Tradesmen* does not create a question of fact. Therefore, this factor, too, weighs in favor of borrowed employee status.

### 9. Who had the obligation to pay the employee?

While there is no dispute that Tradesmen paid plaintiff's wages and managed his tax withholdings, the inquiry does not end there. Rather, the question is intended to be broader: who provided the funds to pay the Holder? *See Capps*, 784 F.2d at 618 ("Since [borrowing employer] paid [lending employer] at an hourly rate for [plaintiff's] work, and then [lending employer] paid [plaintiff] at a lower hourly rate, [borrowing employer] in essence paid [plaintiff]."); *Melancon*, 834 F.2d at 1246. Here, Fraser paid Tradesmen for the work done by Holder, and from those funds, Tradesmen presumably paid his salary. Thus, this factor similarly weighs in favor of borrowed employee status.

Accordingly, even assuming that the control factor is open to some factual dispute, seven of the other eight factors weigh in favor of borrowed employee status and the remaining factor is neutral. Accordingly, the court finds that any reasonable jury would find plaintiff was the borrowed employee of Fraser and therefore his only recourse is a workers' compensation claim.

### III. Claim against Capstan

Like the claim against Fraser, plaintiff brings a § 933 claim against Capstan. (*See* 3d Am. Compl. (dkt. #106) ¶ 66.) Seeking summary judgment, Capstan argues that it "is so interrelated with Fraser . . . [that] it is treated as a single entity for purposes of the [LHWCA's] exclusive remedy provision." (Capstan Summ. J. Br. (dkt. #73) 1.) Capstan adds that the two companies "are so interrelated[] that a suit against one is essentially a suit against the other" because of their shared management employees and corporate offices, and the fact that Capstan is the parent corporation and sole shareholder of Fraser. (*Id.* at 4-5.) For this reason, Capstan argues it is entitled to immunity to the same extent as Fraser. (Capstan Reply (dkt. #113) 1.) Plaintiff argues that Capstan is not entitled to immunity whether or not Fraser is entitled to immunity. (Pl.'s Opp'n (dkt. #98) 57-58.) Specifically, plaintiff argues that Fraser and Capstan are different corporate entities (with different workspaces, websites, logos, and email domains) that played different roles on the *Jackson*, with Capstan having responsibility for safety. (*Id.* at 58, 60.)

Recognizing "that there are many times when separate corporate existence is disregarded in favor of the reality of viewing the corporate organizations in question as a single entity," the court in *Claudio v. United States*, 907 F. Supp. 581 (E.D.N.Y. 1995), determined that two corporate entities "functioned as a single entity and the LHWCA, like the New York Workers' Compensation Law upon which it is based, may be interpreted as 'assur[ing] injured employees of certain compensation but also [] afford[ing] protection to employers against excessive claims for injuries'" such that where two businesses had "interrelation of operations, common management, centralized control of labor relations

and common ownership" they "worked in concert as a single entity." *Id*. at 588 (alteration in original) (internal citation omitted); *see also Price v. Atlantic Ro-Ro Carriers, Inc.*, No. 11-1735, 2017 U.S. Dist. LEXIS 104840, at *10 (D. Md. July 7, 2017) (quoting *Claudio*, 907 F. Supp. at 588, and identifying these factors as considered under the National Labor Relations Act). Whether multiple entities should be deemed one "depends on a totality of the circumstances and is characterized overall by 'an absence of an arm's length relationship found among unintegrated companies.'" *Price*, 2017 U.S. Dist. LEXIS 104840 at *10 (quoting *N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982)). As recognized by *Claudio*, a parent and subsidiary may be viewed as a single entity under New York Workers' Compensation Law and the Sherman Act. *See Claudio*, 907 F. Supp. at 587-88.

While legally separate entities, Capstan is the sole shareholder and parent corporation of Fraser. Moreover, Todd Johnson is the chairman and chief executive officer of both companies, and Scott Brantly is the treasurer and chief financial officer of both as well. They also share a corporate office. Still, they have different worksites, corporate logos and websites, and their employee email addresses have different domains. The only facts addressing the interrelation of the businesses are plaintiff's assertions regarding Fraser's reliance on Capstan for safety management. These facts relate only to safety management, not addressing any other overlap. Further, no party addressed whether Fraser and Capstan share centrally controlled labor relations. Regardless unlike Fraser, Capstan has not established its entitlement to summary judgment.

ORDER

IT IS ORDERED that:

1) Defendant Fraser's motion for summary judgment (dkt. #50) is GRANTED IN PART as to defendant Fraser and DENIED AS MOOT as to former defendant Northern.

2) Defendant Capstan's motion for summary judgment (dkt. #72) is DENIED.

3) Defendant Interlake's motion for summary judgment (dkt. #78) is DENIED. Plaintiff's implicit request to amend the complaint to add explicitly his alternative state law claims (dkt. #98) is GRANTED, and he shall file the amended complaint within 10 days. Except to respond to any newly asserted state law claims and to assert any additional, affirmative defenses specific to those claims, the defendants need not answer.

4) Plaintiff's motion to strike (dkt. #124) is DENIED AS MOOT.

5) Defendant Fraser's motion to sever (dkt. #127) is RESERVED.

6) Trial will proceed on a trifurcated basis: first, the jury will determine whether the *Jackson* was a vessel at the time of plaintiff's injuries; then it will determine liability; finally, if the jury finds liability, it will calculate damages.

Entered this 17th day of January, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge