JAMES HOLDER,

                            Plaintiff,

     v.

THE INTERLAKE STEAMSHIP CO.,
and CAPSTAN CORP.,

                            Defendants,

THE INTERLAKE STEAMSHIP CO.,

                            Cross-Claimant,

     v.

FRASER SHIPYARDS, INC.,

                            Cross-Defendant.

OPINION AND ORDER

16-cv-343-wmc

---

       This case is set for a jury trial commencing April 30, 2018, to resolve plaintiff James Holder's negligence claims stemming from lead exposure while working on the *Herbert C. Jackson*. Following summary judgment, his claims against the ship's owner, The Interlake Steamship Company, and Capstan Corporation remain; also remaining is a cross-claim by Interlake against Fraser Shipyards. Having reviewed the parties' voluminous briefing on various motions in limine, the court cannot help but comment on the sheer number and needlessness of many of these motions. The parties can rest assured that the Federal Rules of Evidence *will* apply to the trial here, and motions that appear intended to confirm that, or worse appear to ask the court to ignore those rules, are not only pointless, but a waste of both counsel's and the court's time, to say nothing of the parties' money. Still, as will be emphasized again at the final pretrial conference, the court is eager to address as many

non-frivolous evidentiary issues as possible in advance of trial out of respect for the jurors' time. Accordingly, the court has taken pains to issue this detailed opinion and order in advance of the final pretrial conference scheduled for April 12 and will allow the parties to seek clarification and address any issues on which the court has reserved at that time.

## OPINION

## I. Plaintiff's Motions in Limine (dkt. #205)

### A. MIL No. 1: Exclude Evidence of, Reference to, or Argument regarding Holder's Use of Cocaine, Marijuana or Alcohol.

Plaintiff's first motion in limine seeks to exclude evidence concerning his use of cocaine, marijuana and alcohol because: (1) Dr. Marion Fedoruk's references "hardly rise to the level of opinion" and are instead "only throw-away comments," based on "ancient facts" that are "too tenuous and remote to be relevant"; and (2) even if relevant, the evidence of drug use is unfairly prejudicial as shown by "the existence of stereotypes and prejudices held against individuals who have had substance abuse issues." (Dkt. #206 at 4-5.) Plaintiff also argues that Fedoruk's report neither discloses "reliable facts or sound methodology" to allow him to opine about cocaine, marijuana or alcohol, nor explains "how these drugs or alcohol could have actually contributed to Mr. Holder's acute physical symptoms . . . and his ongoing cognitive problems." (*Id.* at 2, 4.) Plaintiff further argues that people with past addictions "are stigmatized as 'dangerous, immoral, to blame for their disorder, [and] criminal'" and admitting this evidence "is only one small step removed" from allowing the defendants to argue that plaintiff is all those things, thus jeopardizing the fairness of the trial. (*Id.* at 5.)

Defendants respond that Holder's use of alcohol, marijuana and cocaine is relevant as "evidence of alternative causes of his purported mild cognitive disability" and is presentable to the jury because its probative value is not substantially outweighed by risk of prejudice. (Dkt. #248 at 6; *see also* dkt. #250 at 3-4, 7-9.) Interlake argues that all the experts agree that alcohol and substance abuse can cause neurocognitive deficits and that this evidence is vital to its defense because it challenges plaintiff's experts' opinions on causation. (Dkt. #248 at 7, 10.) Further, Interlake contends that withholding this evidence from the jury would create "a false impression" and that it is not "more inflammatory than other alternative forms of evidence." (*Id.* at 11.) Similarly, Capstan argues that Fedoruk opines that alcohol, marijuana and cocaine can cause neuropsychological impairments, test abnormalities, and functioning, and that plaintiff's long-term alcohol and drug use "could serve as an alternative explanation for Mr. Holder's claimed symptoms." (Dkt. #250 at 3-4.) Capstan further argues that Fedoruk's opinions are admissible because they evaluate "alternative causes of Mr. Holder's injuries," "are not speculative and apply appropriate scientific methodology." (*Id.* at 6.) Capstan adds that plaintiff bears the burden of establishing that lead poisoning caused his injuries and ruling out other possible causes, while providing alternative causes is one way for defendants to show that plaintiff did not meet his burden, and Fedoruk found it unlikely that plaintiff began his relevant work without neurocognitive issues. (*Id.* at 7-8.)

Obviously, plaintiff has the burden of proof at trial to establish that his injuries were more likely than not caused by lead exposure, and defendants may defend by providing alternative causes. However, their ability to do so is cabined by the rules of evidence. Dr.

Fedoruk criticizes plaintiff's experts, Drs. Parker and Crossen, for failing "to account for the potential impact of substance abuse on Mr. Holder's neuropsychological complaints," opining that: (1) "Cannabis use can impair a variety of neuropsychological functions"; (2) "Cocaine use has been associated with neuropsychological test abnormalities"; and (3) "Alcohol abuse has been associated with neuropsychological problems" and "[p]ast heavy use of alcohol can lead to long-standing abnormalities in neuropsychological functioning." (Dkt. #209 at 37-39.) Fedoruk does not appear to opine that plaintiff's drug or alcohol use *was* the cause of his symptoms, but rather that plaintiff's experts failed to consider his history of use.

As the parties recognize, plaintiff's drug and alcohol use is not insignificant. He began using marijuana in high school and continued until 2015. He was fired from a job in 2009, because of a positive marijuana drug test. At some point, he used it once a day after work to relax, but testified that he has decreased his use to once or twice a month for anxiety. As for cocaine, plaintiff acknowledged use once or twice a week for seven years.[1] Finally, as to alcohol use, Holder was apparently arrested for and pled guilty to driving under the influence in 2001, although the admissibility of this information is also unlikely given the potential prejudice.

Indeed, the significance of plaintiff's substance abuse cuts both ways generally. On the one hand, it is potentially probative of the cause of his neurocognitive complaints. On the other hand, it increases the risk of unfair prejudice. The court will, therefore, GRANT

---

[1] The plaintiff was also apparently charged with misdemeanor cocaine possession in 1997, but that charge will obviously not be disclosed to the jury.

plaintiff's MIL No. 1 as to the first two phases of trial and as to any related criminal activity in all phases of the trial. Plaintiff's motion is otherwise DENIED. Defendants may otherwise introduce evidence of drug and alcohol use during the damages phase of trial, and Dr. Fedoruk may testify as to its *possible* impacts. Defendants should be prepared to make a proffer as to admissible proof of use at the final pretrial conference.

**B. MIL No. 2: Exclude Evidence of, Reference to, or Argument regarding Fraser's OSHA Citations and the Lack of OSHA Citations to Others.**

Because this motion is intimately related to Capstan's ninth motion in limine, the court addresses both motions together below.

**C. MIL No. 3: Exclude Opinions of Dr. Paul Nausieda.**

Plaintiff next asks the court to exclude the opinions of Dr. Paul Nausieda because they are not the product of reliable principles and methods. (*See* dkt. #206 at 11.) Specifically, plaintiff argues that Nausieda's report "fails to cite to or rely on a single piece of medical or scientific literature," instead "connect[ing] his observations of Mr. Holder's health (i.e. the data) with his opinions through only his own *ipse dixit*," making his opinions impossible to judge under *Daubert* and therefore unreliable. (*Id.* at 12, 14.) Plaintiff adds that these deficiencies cannot be corrected through testimony. (*Id.* at 12-13.)

Capstan argues that Nausieda's two reports (an independent medical examination and a causation report) both satisfy Rule 26(a)(2)(B) by detailing his conclusions and

methods or reasons. (Dkt. #250 at 14-15.)[2] Based on Nausieda's experience and knowledge, Capstan explains that his causation report appropriately compares plaintiff's symptoms and medical history with the symptoms and medical history of a typical patient with neurological disease caused by lead exposure. (*Id.* at 16-17.)

Because Nausieda's conclusions and reasons are provided "in great detail," plaintiff's main objection would appear to be that Nausieda fails to cite supporting scientific or medical literature. Rule 26(a)(2)(B) instructs what must be included in an expert's written report: "a complete statement of all opinions . . . and the basis and reasons for them"; "facts or data considered"; summary or supporting exhibits; the expert's qualifications, including publications from the past decade and prior expert experience in the past four years; and a compensation disclosure. Fed. R. Civ. P. 26(a)(2)(B). Since Nausieda's causation report appears to satisfy this standard, Capstan argues, plaintiff's objection really stems from Rule 702, which permits an expert -- qualified "by knowledge, skill, experience, training, or education" -- to testify if her "specialized knowledge will help the trier of fact"; the testimony is "based on sufficient facts or data" and "is the product of reliable principles and methods"; and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

In applying Rule 702, a district court is to function as a "gatekeeper," determining whether a party's proffered expert testimony is relevant and reliable. *Daubert v. Merrell*

---

[2] Because plaintiff does not appear to be challenging Nausieda's independent medical exam (*see* dkt. #206 at 11 (only seeking to bar "[t]he opinions in the report of Dr. Paul Nausieda (Ex. B)"); *see also* dkt. #210 (Ex. B); dkt. #233 (independent medical exam)), the court will focus on Capstan's argument concerning the challenged causation report.

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be "not only relevant, but reliable"). Although "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), expert testimony must satisfy the following three-part test:

> [1]the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; [2] the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and [3] the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Accordingly, the Seventh Circuit has cautioned, an expert cannot "offer credentials rather than analysis," "[a]n opinion has a significance proportioned to the sources that sustain it" and "an expert's report that does nothing to substantiate [its] opinion is worthless, and therefore inadmissible." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) (internal citations and quotation marks omitted). Still, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Here, Dr. Nausieda's opinions are based on his review of documents in this case, "a 45 year history of Neurologic practice," and his "extensive clinical evaluation of [approximately 10,000] shipyard welders from 2001 through 2011," as well as experience as faculty at two medical colleges. (Dkt. #210 at 1.) Given his background and experience,

Nausieda is plainly qualified to testify about neurologic impairments caused by lead exposure. Further, he "provided a complete statement of all opinions which he will express, and his reports 'provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions.'" *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 655 (D. Kan. 2003) (internal citations omitted). Likewise, Nausieda "show[ed] a grounding in the methods and procedures of science . . . based on actual knowledge and not subjective belief or unacceptable speculation." *Id.* at 651. As Capstan points out, this case is very different than the situation in *Ciomber*, where the expert report was "woefully deficient" and consisted of "eight terse statements" blaming the defendant for plaintiff's home explosion. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 638, 641 (7th Cir. 2008). Likewise, Nausieda's report is different from that in *Minasian*, where the expert submitted an affidavit "full of vigorous assertion (much of it legal analysis in the guise of banking expertise), carefully tailored to support plaintiffs' position but devoid of analysis." 109 F.3d at 1216. Nausieda will obviously be limited to the opinions and underlying support set forth in his report, and plaintiff's counsel to free to point out the absence of specific studies or scientific literature supporting his opinions, but plaintiff's MIL No. 3 will be DENIED.

### D. MIL No. 4: Strike Errata Sheets for James Farkas and Grant Huttel.

Plaintiff asks that the changes in the errata sheets of Fraser Shipyards' CEO James Farkas and Capstan's Safety Director Grant Huttel be stricken because the changes substantively alter the witnesses' testimony. (Dkt. #206 at 14.) He argues that the Seventh Circuit instructs that under Rule 30(e)(1)(B) "a change of substance which

actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" (*Id.* at 15 (quoting *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000)) (quotation marks omitted).) Plaintiff then identifies changes he contends "run afoul of the rules." (*Id.* at 15-18.) He also asks the court to strike Huttel's entire errata sheet because it does not provide any reasons for the changes, thus failing to comply with Rule 30(e). (*Id.* at 17.) Defendant Interlake "joins" in this motion as relating to Farkas and provides its own list of "substantive changes [to] be stricken." (Dkt. #264 at 1-2.)

Unsurprisingly, Capstan opposes this motion, arguing generally that Rule 30(e) allows a deponent to change his testimony, and the factfinder can judge his credibility with errata sheet in hand. (Dkt. #250 at 21.) Capstan convincingly distinguishes *Thorn* from the present situation procedurally, as *Thorn* addressed errata sheets at summary judgment -- comparing them to sham affidavits that cannot create genuine disputes of fact -- as opposed to credibility determinations appropriately made at trial before the jury. (*Id.* at 21-24.)

Capstan is correct on both counts as to Farkas's errata sheet. *Thorn* and the sham affidavit doctrine that underlies it are applicable *at summary judgment* to prevent "clever counsel" from unfairly manufacturing genuine disputes of material fact. *United States ex rel. Robinson v. Indiana University Health Inc.*, 204 F. Supp. 3d 1040, 1044 (S.D. Ind. 2016). "At every other stage of proceedings, counsel is free to argue that a contradictory affidavit or errata change warrants little or no weight -- and the court or jury is free to agree or disagree." *Id.*; *see also Lugtig v. Thomas*, 89 F.R.D. 639, 641-42 (N.D. Ill. 1981) (overruling

objections to 69 substantive changes to deponent's answers, explaining that "[t]he original answer to the deposition questions will remain part of the record and can be read at the trial").[3] Therefore, the court will *not* strike Farkas's errata sheet.[4]

The analysis is different for Huttel's errata sheet. While his edits are far fewer in number and far less substantive that those proposed by Farkas, he fails to provide *any* reason justifying the changes. (*See* Dkt. #206-15.) "If the [deponent] wishes to invoke the privilege accorded deponents by Rule 30(e), . . . he must comply with the instructions which the Rule gives for making changes in deposition testimony. . . . [A]fter each change, the deponent must state the specific reason for that particular change." *Lugtig*, 89 F.R.D. at 641; *see also* Fed. R. Civ. P. 30(e)(1)(B) ("if there are changes in form or substance, [the deponent must] sign a statement listing the changes *and the reasons for making them*" (emphasis added)). Because Huttel did not comply with Rule 30(e), his errata sheet is stricken *unless* within *5 days* of this order he sets forth *in writing* the *specific* reason for each change in an amended errata sheet *and* Capstan electronically files and sends the amended sheet within 24 hours of its completion.[5]

---

[3] In *Lugtig*, the court was not impressed with the reason that the deponent "didn't understand the question or was confused at the time of answering," requiring the deponent "to have the changes he wishes to make in his deposition testimony and the reasons for the changes written in the deposition at the point of change and after the original answer by the reporter." 89 F.R.D. at 641-42.

[4] The revised answers proposed for page 198 effectively constitute legal objections and will be addressed at the final pretrial conference. If Farkas is correct that "Capstan Corporation was not responsible for Mr. Holder" because of "the contractual relationship between Fraser and Tradesmen" (*see* dkt. #206 at 16), then the question and answer are stricken as calling for a legal conclusion. If Farkas is wrong, the question and the original answer stand.

[5] Counsel in future cases should not anticipate such leeway, especially if the errata sheet is *both* voluminous or substantive *and* includes no explanation.

Accordingly, plaintiff's MIL No. 4 is GRANTED IN PART and DENIED IN PART.

## E. MIL No. 5: Prevent Defendants from Eliciting Expert Opinions Not Properly Disclosed under Rule 26(a)(2)(A).

Plaintiff also unnecessarily asks that the court prevent defendants from eliciting expert testimony unless disclosed in defendants' expert disclosures. (Dkt. #206 at 18.) The defendants do not appear to oppose this request. (*See* dkt. #250 at 24 (Capstan's opposition: "No dispute.").) Nor could they. Nevertheless, plaintiff's motion is DENIED AS MOOT. All parties will be limited to eliciting expert opinions *and* the underlying basis for those opinions to those set forth in the expert's report, or in the case of uncompensated experts in their Rule 26(a)(2)(C) disclosures, and the proponent's counsel should be prepared to cite page and lines in response to any objection on that basis.

## F. MIL No. 6: Exclude Improper Character Evidence of James Holder.

Plaintiff next asks the court to bar evidence of his past convictions for a drug possession misdemeanor in 1997 and driving under the influence in 2001. (Dkt. #206 at 18-19.) He argues that evidence of either should be excluded because: (1) neither crime involved dishonesty; (2) there is no evidence showing either was punishable by imprisonment for over a year; and (3) each conviction is over a decade old. (*Id.* at 19.)

While both defendants oppose this motion, the prejudicial nature of this evidence is manifest and arguments that they are outweighed by its probative value border on the frivolous, except perhaps if plaintiff were to open the door by denying his habitual use of alcohol or drugs during the third phase of trial. Accordingly, the court will GRANT

plaintiff's MIL No. 6.

### G. MIL No. 7: Exclude Evidence of, Reference to, or Argument regarding Holder's Sexual Conduct or How He Found His Lawyers.

Plaintiff's final motion in limine asks the court to "bar reference to Mr. Holder's sexual conduct or how he found his lawyers." (Dkt. #206 at 20.) He explains that defense expert, neuropsychologist Dr. Lawrence Binder, prepared a report based on an exam and interview. (*Id.* at 19.) In one paragraph, Binder addresses Holder's "'ability to initiate activity,'" which details how Holder retained his counsel and "a purported quotation from Mr. Holder about a camping trip with a girlfriend where he was 'f**king all night.'" (*Id.*) Holder argues that these details are irrelevant and should be excluded under Rules 401 and 402 because he has not alleged a loss of sexual function/capacity due to his lead poisoning and Binder could show Holder's capacity "to initiate activity and make plans" by other means. (*Id.* at 19-20.)

This motion is opposed by both Interlake and Capstan. Interlake argues that Holder's "ability to independently research and retain counsel" and his sexual conduct "are relevant and critical to Interlake's causation defenses" because the former was important to Dr. Binder's analysis whether Holder had a neurocognitive disability and the latter showed Holder's "life is normal in terms of activities and ability to function," with both showing "that any cognitive disabilities were nuisance level and not disabling." (Dkt. #244

at 1-2, 4.)[6] Capstan is not as blatant in its attempt to parade prurient material before the jury, partially opposing plaintiff's motion by arguing that Holder "*offered* the example of conducting an internet search to locate and retain his attorneys to demonstrate his ability to initiate activity" and because of the very limited interview Holder permitted Binder to conduct, "there are limited other examples of Mr. Holder's ability to initiate activity." (Dkt. #250 at 28 (emphasis original).) Unlike Interlake, however, Capstan represents that it does not plan to inquire about plaintiff's sexual conduct, so long as Holder or his experts do not open the door by "introduc[ing] evidence that Mr. Holder's sex life has been affected by, or may be affected in the future by, his alleged lead exposure." (*Id.*)[7]

To his credit, plaintiff concedes that there may be probative value in illustrating his ability to initiate activity or make plans (*see* dkt. #206 at 20), but argues that Dr. Binder could have relied on "numerous other means" to do so, rather than the two examples detailed in Binder's report: (1) Holder's retention of his attorneys and (2) his trip to Cannon Beach, Oregon. (Dkt. #211 at 6.)[8]

Assuming plaintiff is correct and that there are other examples of plaintiff's facile use of the internet to search and plan, his doing so to search for counsel in this case strikes

---

[6] Specifically, Interlake argues that Holder cannot show that the prejudicial nature of this information outweighs its probative value because (1) "[t]he jury should be permitted to hear Holder's own, undisputed classification of his sexual activity" and (2) that he could "develop a strategy to use the internet to find a lawyer . . . is significant for someone who is alleging to experience mild neurocognitive disorder." (Dkt. #244 at 4-5.)

[7] Capstan does, however, argue that "Holder's ability to initiate and plan a trip to Cannon Beach, Oregon, without reference to the sexual activities" would be relevant. (Dkt. #250 at 28.)

[8] Although Binder reports that Holder declined to answer questions about dating, before addressing his medical care, the court notes that Binder noted that during his examination, Holder scored in the 68th percentile on the Tower of London test, which requires planning. (Dkt. #211 at 6-7.)

the court as a needless and potentially prejudicial side show, more likely to waste time than its probative value would justify under Fed. R. Evid. 403, unless plaintiff opens the door by denying his skills in this area or intimating disinterest in being compensated for his claimed injuries. Moreover, because plaintiff is not claiming his lead exposure has caused any loss of sexual capacity or function (*see* dkt. #206 at 19-20), the probative value of this evidence is far outweighed by the possible unfair prejudice caused by the crudeness of the statement Binder would attribute to the plaintiff, unless again plaintiff were to open the door by suggesting a loss in this area. Defendants may, however, reference plaintiff's ability to plan and execute the trip as Capstan suggests, sans reference to any sexual activities. Thus, plaintiff's MIL No. 7 is GRANTED.

## II. Defendant Capstan's Motions in Limine (dkt. #192)

### A. MIL No. 1: Exclude Nicholas Minardi's Sworn Statement.

Capstan's first motion in limine seeks to exclude as hearsay and as unfairly prejudicial the sworn statement of Nicholas Minardi from January 16, 2017, which was taken without notice to Capstan and without any defense counsel present. (Dkt. #193 at 3.) To the extent the purpose of this motion is to prevent admission of this sworn statement *into* evidence, it is wholly unnecessary since the court can think of no circumstances under which it would admit rank hearsay.[9] To the extent it is intended to prevent use of the sworn statement to refresh recollection, it is frivolous. Indeed, Capstan

---

[9] Under limited circumstances, the statement might be admissible if Minardi were unavailable. Regardless, plaintiff acknowledges that he "does not seek to admit the statement as substantive evidence." (Dkt. #257 at 6.)

notes that it reserves the right to use the sworn testimony for impeachment purposes if necessary. (*Id.* at 4 n.2.)

This then leaves plaintiff's use of the sworn statement "by experts," which plaintiff notes both his experts and Interlake's experts have relied upon in forming their opinions. (Dkt. #257 at 6-7.) As plaintiff points out, Rule 703 permits an expert to rely on inadmissible evidence "[i]f of a type reasonably relied upon by experts in the particular field" and to testify about her opinions based thereon. Fed. R. Evid. 703; *see also U.S. v. Rollins*, 862 F.2d 1282, 1293 (7th Cir. 1988). The question then is whether specific references meet this threshold. Since the court is concerned some may not -- particularly as related to the *Jackson* repowering project, and assertions that decisions were made prioritizing profit over safety and that Capstan was responsible for the lead poisoning of workers (Dkt. #193 at 3-4) -- the court will allow plaintiff to make a specific proffer at the final pretrial conference as to the *specific* hearsay statements its experts may refer to in testimony at trial (as opposed to statements by Minardi admitted into evidence at trial). Accordingly, Capstan's MIL No. 1 is GRANTED IN PART, DENIED IN PART and RESERVED IN PART.

## B. MIL No. 2: Exclude Evidence of or Reference to Lead Causing a Loss of Brain Volume.

Capstan next seeks to exclude all evidence that exposure to lead causes a decrease in brain volume, as shown by MRI studies, because no expert has testified that plaintiff has lost any brain volume and plaintiff has not had any MRI studies taken. (Dkt. #193 at 7.) Specifically, Capstan argues that this evidence would be irrelevant and unfairly

prejudicial.  (*Id.*)  This motion is joined by Defendant Interlake.  (*See* dkt. #263 at 1.)

In response, plaintiff argues that if his motion in limine seeking to exclude his drug and alcohol use is denied, then Dr. Parker should, as a matter of fairness, be permitted to discuss scientific literature that showed loss of brain volume in workers exposed to lead in studies that controlled for drug and alcohol use.  (Dkt. #257 at 7-8.)[10]  The court agrees, and consistent with its ruling on plaintiff's first motion in limine, the court will GRANT Capstan's MIL No. 2 as to the first two phases of trial and DENY as to the last phase.

## C.  MIL No. 3: Exclude All References to Asbestos and Other Heavy Metals.

Next, Capstan seeks to exclude references to heavy metals and asbestos exposure aboard the *Jackson* as irrelevant, unfairly prejudicial to Capstan and otherwise confusing to the jury.  (Dkt. #193 at 8.)  This motion is joined by Defendant Interlake.  (*See* dkt. #263 at 1.)  Capstan explains that plaintiff's expert, Dr. Parker, references exposure to asbestos (and its risk of lung cancer, mesothelioma, and asbestosis), hexavalent chromium (and its status as a carcinogen and specific risk of lung cancer) and other iron oxides, while Dr. Crossen refers to other materials.  (Dkt. #193 at 7.)  Yet, Parker does not offer opinions on exposure, other than lead exposure, and even testified that it was "unlikely" plaintiff was injured by other exposures.  (*Id.* at 8.)

Despite asking for this motion to be denied in its entirety, plaintiff confirms that the only toxin-exposure giving rise to his claims is lead.  (Dkt. #257 at 8, 10.)  He argues that "certain important events involving asbestos are critical to the narrative," specifically

---

[10] Plaintiff notes that if his motion in limine is granted, Capstan's second motion in limine should also be granted.  (Dkt. #257 at 8.)

that: (1) the Repowering Contract specified that "it is the Contractor's responsibility to safely remove any and all asbestos and lead paint that is disturbed as a result of this conversion"; (2) the kick-off meeting addressed asbestos abatement, but did not address a lead abatement program; (3) on January 6, 2016, an OSHA inspector expressed "concerns about ventilation and smoke, hexavalent chromium, asbestos and lead," with the comments being discussed by Capstan and Fraser management. (*Id.* at 8-10.) Finally, he argues that excluding this evidence would "change the narrative of what happened" and that any potential prejudice can be cured with a limiting instruction. (*Id.* at 10.)

Capstan's MIL No. 3 is GRANTED IN PART and DENIED IN PART. Because plaintiff is not seeking to recover for injuries caused by other hazards -- and is not offering an expert opinion that he was harmed by them -- there is a risk that the jury may find defendants liable because plaintiff was exposed to many dangerous compounds. Accordingly, references to non-lead exposure are generally inadmissible. The analysis is slightly different regarding asbestos, however, since its abatement is specifically referenced with lead in the Repowering Contract. Plaintiff and his experts will be able to contrast the existence of the asbestos abatement plan with the contested existence of a lead abatement program. To avoid prejudice, however, the parties are not to suggest or intimate that plaintiff's exposure to asbestos, if any, was a contributing factor to defendants' possible negligence, nor to any injury he may have suffered while working on the *Jackson*. Similarly, the jury will be admonished not to consider exposure to asbestos in determining negligence, causation or damages. The form of this admonition will be addressed at the final pretrial conference.

### D. MIL No. 4: Exclude Evidence or Reference to Flint, Michigan and Other Examples of Water Contamination.

Capstan argues that "[a]ny evidence or reference to the Flint Water Crisis or other water contamination should be prohibited as irrelevant to whether Plaintiff was exposed to lead while working on the Herbert Jackson" and that even if relevant its probative value would be substantially outweighed by the prejudicial effect. (Dkt. #193 at 8-9.) Plaintiff does not oppose this motion (dkt. #257 at 1). Capstan's MIL No. 4 will, therefore, be GRANTED as unopposed.

### E. MIL No. 5: Exclude Evidence Concerning Any Examination of Plaintiff Performed by Dr. Parker.

At the time Dr. Parker was deposed, Capstan explains that he had already issued his report and addendum, but had not examined the plaintiff, yet testified that he might do so. Accordingly, Capstan requests that any evidence concerning a later examination be excluded because such information was not disclosed. (Dkt. #193 at 9-10.) Defendant Interlake joins this motion. (*See* dkt. #263 at 1.) Capstan's MIL No. 5 is GRANTED as unopposed. (*See* Dkt. #257 at 1.)

### F. MIL No. 6: Exclude Any Legal Conclusions Offered by Plaintiff's Experts.

Capstan asks the court to exclude opinions by plaintiff's experts that constitute legal conclusions. (Dkt. #193 at 10-11.) Interlake joins this motion (dkt. #263 at 1) and plaintiff does not oppose it. (Dkt. #257 at 1.) Accordingly, Capstan's MIL No. 6 is GRANTED as unopposed.

### G. MIL No. 7: Exclude References to Capstan's Insurance.

Capstan next requests that reference to its insurance be excluded under Rule 411, which prohibits admission of evidence about insured status on the question of whether the person or entity acted wrongfully or negligently. (Dkt. #193 at 11.) Plaintiff does not oppose this motion (dkt. #257 at 1), and it, too, is GRANTED.

### H. MIL No. 8: Exclude References to Punitive Damages Until Plaintiff Makes a Prima Facie Case for Them.

Capstan argues that introducing the concept of punitive damages before plaintiff has established a prima facie case for them would be unfairly prejudicial and confusing to the jury if addressed at voir dire and in opening statements, particularly if the court then determined they were unwarranted. (Dkt. #193 at 11-12.) This motion is joined by Interlake (*see* dkt. #263 at 2) and unopposed by plaintiff (dkt. #257 at 1). Accordingly, Capstan's MIL No. 8 is GRANTED as unopposed. Regardless, *all* references to damages will await phase three of this trial.

### I. MIL No. 9: Exclude Reference to and Evidence of OSHA Citations and the Settlement Thereof.

Representing that he does not intend to introduce evidence concerning "the issuance or not of OSHA citations related to the conduct at issue," plaintiff's MIL No. 2 seeks to prevent defendants from referencing or offering evidence of OSHA citations, arguing they are hearsay, irrelevant, misleading, unduly prejudicial, and confusing. (Dkt. #206 at 6.) First, plaintiff argues that OSHA citations "are nothing more than charging documents," which were issued in the discretion of the OSHA safety inspectors, and while

public records under Rule 803(8)'s hearsay exception, they lack the required trustworthiness to be admissible under Fed. R. Evid. 803(8)(A)(iii) and (B), as there is nothing in the record establishing what documentation, skill or experience the investigator had *and* plaintiff's experts found additional violations that did not result in citations. (*Id.* at 7-9.) Second, plaintiff argues the citations are "irrelevant because they do not make facts of consequence more or less likely to be true." In particular, plaintiff argues that "while evidence of violations of OSHA standards are plainly relevant, the Citations themselves as alleged by OSHA (and contested by Fraser Shipyards) are irrelevant to the issues" in this case. (*Id.* at 9-10.) Third and finally, plaintiff argues that any probative value the citations may have "would be substantially outweighed by the risk of unfair prejudice, misleading of the jury, and confusion of the issues," because the jury might infer that OSHA had conclusively determined Capstan and Interlake had done nothing wrong since only Fraser had received citations. (*Id.* at 10-11.)

Essentially agreeing with plaintiff as to the formal OSHA citations, Capstan in its MIL No. 9 would go further and exclude all references to OSHA citations, standards or rulings as applied to or violated by, Capstan. (Dkt. #250 at 9.) Capstan explains that plaintiff's claims for negligence under either maritime or Wisconsin law could prevail at trial without referencing OSHA, which is only evidence of a standard of care. (*Id.* at 10.)

Where Capstan diverges from plaintiff is its desire to exclude the *substance* of the OSHA citations, press release and settlement agreement as hearsay (collectively the

"OSHA documents").[11] Just as plaintiff does with respect to the OSHA citations, Capstan argues that the OSHA documents do not qualify as public records under Rule 803(8)(A) & (B) because they are not sufficiently trustworthy, as there was no final fact finding or hearing at which a final judgment of violation was issued, and there is no evidence concerning the issuing official's skill and education. (*See* dkt. #193 at 14-17.) Capstan adds that "because the Stipulation and Settlement Agreement and the press release are premised on the information contained in the citations, a finding that the citations lack trustworthiness mandates . . . the exclusion of those documents as well." (*Id.* at 17.)

Capstan next argues that the OSHA documents are irrelevant because those documents "are replete with references to [non-lead] other substances and other alleged safety violations," and that non-lead citations should be inadmissible and references thereto should be redacted from the press release, settlement agreement, amended penalty and any other OSHA document. (*Id.* at 18.) Capstan then argues that the OSHA documents are inadmissible under Rule 403 because of the risk of "overwhelming" unfair prejudice; specifically, the evidence "is likely to mislead a jury when issued to a party other than the defendant in the case," creating the possibility that the jury will "impute Fraser's

---

[11] Capstan explains that OSHA issued two citations to Fraser Shipyards: one for alleged serious violation and one for alleged willful violation of the Occupational Safety and Health Act of 1970. (Dkt. #193 at 12.) Some of the citations include violations to cadmium, arsenic, iron oxide, asbestos, chromium and fall risks, while others relate to lead exposure. (*Id.* at 12-13.) The total fine assessed was $1,395,000. (*Id.* at 13.) Following the investigation, the Department of Labor issued a press release criticizing Fraser for "prioritiz[ing] profits and deadlines over the health and safety of [its] workforce," and "ignor[ing] federal regulations, its own corporate safety manuals and worker concerns." (*Id.*) After initially contesting the citations, Fraser entered a settlement agreement, resolving the citations for $700,000 and providing that "[t]he agreements, statements, stipulations, findings and actions taken herein are made for the purpose of settling this matter amicably and they shall not be used for any purpose, except proceedings and matters arising under the Act." (*Id.* at 13-14.)

alleged OSHA violations, as well as the alleged acts and omissions . . . as evidence in support of finding Capstan negligent." (*Id.* at 19-20.) Further, Capstan asserts, these documents would "result in the needless presentation of cumulative evidence," as plaintiff plans to provide other evidence about lead safety. (*Id.* at 20.) Finally, Capstan contends that the settlement agreement between Fraser and OSHA is inadmissible under Rule 408 because it "is evidence of Fraser's acceptance of an offer to compromise OSHA claims," which would be contrary to the settlement agreement's language and public policy encouraging compromise. (*Id.* at 20-21.)[12]

Unlike his request to exclude the fact of OSHA citations, plaintiff argues that the so-called factual conclusions and opinions reached by OSHA *should* be admitted. (Dkt. #257 at 10.) In trying to have his cake and eat it too, plaintiff argues that although the OSHA citations themselves do not, redacted versions of the OSHA documents fit within the public records exception, have not been shown to be untrustworthy, the facts included "are obviously relevant," and the evidence is neither cumulative nor misleading. (*Id.* at 14-15.)

Interlake opposes both motions. (*See* dkt. ##268, 270.) In response to plaintiff's motion to exclude only the formal OSHA citations, Interlake persuasively argues that plaintiff is trying to use the OSHA standards "as both a sword and a shield," because he wants to exclude the citation evidence, but wants to have his expert opine on additional

---

[12] Capstan also opposes plaintiff's reliance on his experts' opinions that Capstan violated OSHA standards, which means that Capstan should be able to use the zero citations it received as rebuttal evidence. (Dkt. #250 at 10-14.) Finally, Capstan argues that permitting it to use OSHA evidence in rebuttal would prevent unfair prejudice to Capstan and prevent the jury from being misled. (*Id.* at 14.)

citations that *could* have been issued, but were not. (Dkt. #268 at 2.) Interlake explains that the OSHA citations are relevant for three reasons: (1) plaintiff's (challenged) experts opine that Interlake could have been cited under OSHA's Multi-Employer Citation Policy, such that it has a right to defend itself and show that only Fraser was cited; (2) evidence of applicable OSHA violations can evidence negligence; and (3) even if plaintiff's expert opinions are excluded, the OSHA violations are relevant to apportionment, which is recognized by Wisconsin law. (*Id.* at 3-4.)[13] Interlake further argues the citations are admissible under Rule 803(8) because plaintiff failed to meet his burden of showing that they lack trustworthiness and other courts have found OSHA citations admissible. (*Id.* at 5-8.) Finally, Interlake contends this evidence is not misleading if admitted, but rather excluding it would be prejudicial to Interlake because that would: (1) permit plaintiff's experts to argue Interlake *could* have been cited under OSHA while foreclosing Interlake's argument that it *was not* cited; and (2) prevent Interlake from using this evidence for apportionment purposes. (*Id.* at 8-9.)

"[F]or the same reasons set forth in its opposition to Holder's Motion *in limine* No. 2, Interlake opposes Capstan's request to exclude the OSHA Citation to the extent that it cites Fraser Shipyards for lead-related violations." (Dkt. #270 at 1.)[14] Similarly, Interlake argues that Capstan failed to meet its burden of establishing that the OSHA citation is

---

[13] Even Interlake acknowledges that OSHA citations for non-lead related violations are irrelevant. (Dkt. #268 at 4 n.2.) The court agrees and all OSHA citations unrelated to lead are inadmissible consistent with the court's ruling on Capstan's MIL No. 3.

[14] Interlake has represented that it "has no intention of referring to or offering as evidence either the Stipulation and Settlement Agreement or the press release." (Dkt. #270 at 1.)

untrustworthy because: (1) the citation did not need to detail the investigator's qualifications; (2) the language in the citation concerning a "right-to-contest" does not demonstrate untrustworthiness; and (3) a hearing is not necessary for the citations to be trustworthy. (*Id.* at 3-6.) Finally, Interlake reiterates its arguments that no unfair prejudice would result from admission, but unfair prejudice to Interlake (and Capstan) would result from exclusion. (*Id.* at 6-7.)

In the end, plaintiff's and Capstan's motions rise or fall together -- either the existence *and* substance of the OSHA documents are both admissible, or both are inadmissible. Rule 803(8)(A)(iii) creates an exception to the general rule against hearsay for public records "in a civil case," for "factual findings from a legally authorized investigation," where "the opponent does not show that the source of information or other circumstance indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(iii) & (B). The Seventh Circuit has explained that courts are to "assume that public officials, in crafting [their] report[s], acted 'properly and without bias.'" *Daniel v. Cook County,* 833 F.3d 728, 740 (7th Cir. 2016) (quoting *Jordan v. Binns*, 712 F.3d 1123, 1134 (7th Cir. 2013)). Additionally "the general presumption of admissibility in the text of Rule 803(8) has considerable force" and "[t]he burden of persuasion still lies with the party seeking to exclude the investigative findings." *Id.* at 741-42. However, the court is persuaded that the OSHA citations and the underlying statements in support are no more than an

indictment, which Fraser was free to dispute, but chose instead to compromise.[15]  At no point did OSHA reach *any* final factual findings in its investigation into the claims of OSHA violations during the repair of the *Jackson*, and there is a substantial risk of misleading the jury, confusing issues, and potential prejudice if *any* party were allowed to introduce the OSHA citations or their underlying bases in this case.  Accordingly, both plaintiff's MIL No. #2 and Capstan's MIL No. #9 are GRANTED, and no party shall be allowed to reference, or offer into evidence, evidence of any OSHA investigation, citations or underlying substance.

## J.  MIL No. 10: Exclude Evidence of Plaintiff's Future Medical Expenses or His Alleged Eye Injury.

Capstan next seeks to exclude evidence of plaintiff's future medical expenses because none of his experts have opined that future treatment would be necessary for the injuries he alleges resulted from lead exposure.  (Dkt. #193 at 22.)  Further, Capstan seeks to exclude evidence of plaintiff's eye injury because he has failed to present any evidence tying the injury to his work on the *Jackson*.  (*Id.*)  Defendant Interlake joins this motion.

---

[15] As no party intends to offer the press release, it is excluded.  The settlement agreement also is out.  While Capstan argues that it is inadmissible under Rule 408, the Seventh Circuit has interpreted "the claim" language in that rule narrowly.  *See Wine & Canvas Dev., LLC v. Muylie*, 868 F.3d 534, 541 (7th Cir. 2017) ("The Rule's use of the singular term 'claim' suggests that settlement discussions concerning a specific claim are excluded from evidence to prove liability on *that* claim, not on others.  That is, when a settlement discussion concerns Claim A, and statements from that discussion are later offered to prove or disprove liability on Claim B, Rule 408(a) does not make those statements inadmissible.").  Since the settlement agreement here was between the Department of Labor and Fraser, that claim is not at issue.  However, this does not address the hearsay relevance and potential of unfair prejudice of its admission.  The only basis now advanced for admission over a hearsay objection is Rule 803(8), which is inapplicable as the settlement agreement is not a public record.  Accordingly, the settlement agreement is also excluded.  The discussion at summary judgment is not to the contrary.  (*See* dkt. #149 at 10 n.8.)

(*See* dkt. #263 at 2.) Plaintiff does not oppose it. (Dkt. #257 at 2.) Thus, Capstan's MIL No. 10 is GRANTED as unopposed.

### K. MIL No. 11: Bar Plaintiff from Seeking Loss of Earnings or Loss of Future Earning Capacity.

Capstan further argues that plaintiff cannot satisfy his burden of proof on a claim for lost earnings: he was working for CTR Newport News in Oregon when he learned of the possible lead exposure and is currently employed by Versa Corporation. (Dkt. #193 at 23.) Further, Capstan argues that plaintiff cannot seek recovery for a loss of future earning capacity because he lacks the necessary expert testimony to establish this claim and a jury could not calculate lost earning capacity to any reasonable certainty. (*Id.* at 23-24.) Plaintiff does not oppose this motion either. (Dkt. #257 at 2.) Accordingly, Capstan's MIL No. 11 is also GRANTED as unopposed.

### L. MIL No. 12: Prevent Plaintiff from Offering Additional Expert Opinions.

Similar to plaintiff's fifth motion in limine, Capstan seeks to prevent plaintiff from introducing expert opinions at trial that have not already been disclosed. (Dkt. #193 at 24-25.) Unsurprisingly, plaintiff does not oppose, other than to point out that this exclusion applies across the board. (Dkt. #257 at 2 & n.2.) Since this is exactly right, Capstan's MIL No. 11 is also DENIED AS MOOT.[16]

---

[16] The court is in receipt of Capstan's request to file a supplemental motion in limine seeking to exclude additional opinions elicited by plaintiff at the deposition of Capstan's expert, Dr. Fedoruk. (Dkt. #273; *see also* dkt. #274.) The court RESERVES and will take this up at the final pretrial conference. If plaintiff chooses to file a response, he must do so ***by 4:30 p.m. on April 11, 2018***.

### M. MIL No. 13: Bar Reference to the Crane Incident and the Prior OSHA Investigation.

Finally, Capstan moves to exclude all references to and evidence of a crane incident and a prior OSHA investigation, which were asked about at Fraser employees' depositions. (Dkt. #193 at 25-26.) Specifically, Capstan argues that (1) plaintiff's only purpose for this evidence would be to establish propensity; (2) neither incident was close enough in time or similar enough in nature to be relevant, as the incident in 2015 involved the failure of a hoist line and the lead incident occurred in 1993; (3) there is insufficient evidence to show that defendants acted similarly in either incident; and (4) admitting this evidence creates a risk of unfair prejudice because a jury could impute Fraser's prior conduct to Capstan and Interlake. (*Id.* at 26-27.)

In response, plaintiff only opposes the request to bar evidence concerning the crane incident.[17] Plaintiff and his expert Dr. Rachel Jones want to rely on the crane incident to establish that Capstan had fostered a "poor safety culture" at Fraser Shipyards. (Dkt. #257 at 20-22.) Plaintiff argues that the crane incident is not being offered to prove propensity, but rather "to prove motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake" and that the incident "explains the circumstances of the safety culture, provides the background for and development of safety on the *Jackson*, and helps complete the story about the circumstances surrounding the Capstan safety

---

[17] Plaintiff represents that he will not introduce evidence of the 1993 OSHA investigation unless the defendants open the door, promising not to mention it until after informing the defendants and the court outside the presence of the jury of his intention. (Dkt. #257 at 19.) Since the court will reject all reference to the 1993 investigation, this offer is mooted, although any argument that defendants have opened the door certainly should take place outside the jury's presence *and* before its introduction into evidence.

manager's eventual abandonment of the project." (*Id.* at 25.) Further, plaintiff contends this is relevant to his request for punitive damages against Interlake, whose representative Mike Wolny failed to document the crane incident, despite knowing about it. (*Id.*) Plaintiff also argues that this incident was close enough in time -- mere weeks before plaintiff started working on the *Jackson* -- and of similar character because: (1) it was part of the same project on which plaintiff worked; (2) it involved OSHA violations resulting from a serious near-miss, and (3) it was caused by the same "ineffective safety culture at Capstan" that led to a lack of proper lead abatement program. (*Id.* at 25-26.) He adds that there is no dispute this occurrence happened and that Capstan's fear that the jury would punish Capstan for Fraser's actions could be addressed by jury instructions. (*Id.* at 26.)

Rule 404(b) permits the use of other acts "only when its admission is supported by some propensity-free chain of reasoning." *U.S. v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014).[18] As the Seventh Circuit explained,

> it's not enough for the proponent of the other-act evidence simply to point to a purpose in the "permitted" list and assert that the other-act evidence is relevant to it. Rule 404(b) is not just concerned with the ultimate conclusion, but also with the chain of reasoning that supports the non-propensity purpose for admitting the evidence. In other words, the rule allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning. . . . Rule 404(b) excludes the evidence if its relevance to "another purpose" is established *only* through the forbidden propensity interference.

---

[18] In their briefing, the parties rely on the four-part test in *Treece v. Hochstetler*, 213 F.3d 360, 363 (7th Cir. 2000). However, the Seventh Circuit recently found that its "four-part test for evaluating the admissibility of other-act evidence has ceased to be useful" and has "abandon[ed] it in favor of a more straightforward rules-based approach." *Gomez*, 763 F.3d at 853.

*Id.* at 856 (emphasis in original) (internal citations omitted). Accordingly, courts are supposed to "not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose . . . without relying on a propensity inference." *Id.* (emphasis in original).

While plaintiff has argued that the evidence of the crane incident would not be used to show propensity, he acknowledges that he wants to argue that Capstan had a "poor safety culture," which is plainly *not* a propensity-free chain of reasoning, rather it depends on the logic that Capstan was irresponsible with lead abatement *because* it was irresponsible with another safety incident. In *Gomez*, the Seventh Circuit noted that relying on "similarity" and "timing . . . as formal boxes to check in the admissibility analysis" created a very "tempting" risk of "stop[ping] at superficial comparisons without meaningfully analyzing how the similarity and recency of the prior bad act affect its relevance in the unique circumstances of the case" and that "the similarity and timing of the other act may not bear on the relevance question at all." *Id*. at 855. While the crane incident was quite close in time to plaintiff's work on the *Jackson*, it was not factually similar, as it involved the fraying of a hoist line, not exposure to a known toxin or other chronic, day-to-day health risk.

Perhaps a string of violations of various kinds in the same time frame might support plaintiff's argument that Capstan had a mindset of indifference to worker safety, but a single, additional violation -- even a serious one, occurring around the same time -- is nothing more than evidence of propensity, especially where the similarities are relatively remote. Accordingly, Capstan's MIL No. 13 is GRANTED.

**III. Cross-Defendant Fraser Shipyards, Inc.'s Motions in Limine (dkt. #187)**

   **A. MIL No. 1: Exclude Evidence in Support of Interlake's Cross-Claims against Fraser.**

Fraser Shipyards argues that the indemnification provision of the Shipbuilding Contract between it and Interlake is void under § 905(b) of the Longshore and Harbor Worker's Compensation Act ("LHWCA" or the "Act"). (Dkt. #187 at 2.) The Shipbuilding Contract provides that

> Builder shall indemnify, protect, defend . . . and hold harmless the Owner and all of Owner's officers, agents, and employees and Owner's Vessel from any and all claims, suits, and judgments against Owner from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such personal injury or death.

(*Id.* (quoting dkt. #86 ¶ 10).) However, § 905(b) provides that "the employer shall not be liable to the vessel for such damage [to a person covered under the Act] directly or indirectly and any agreements or warranties to the contrary shall be void." 33 U.S.C. § 905(b).

Fraser argues that courts have "uniformly" and "universally" adopted Congress's intent to limit an employer's liability under the Act to *only* that liability, including invalidating a duty to defend a vessel. (Dkt. #187 at 3-4.) Fraser adds that permitting a "vessel to shift the cost of failing to provide a safe workplace . . . creates a disincentive for . . . promoting safety." (*Id.* at 4.) Thus, Fraser argues that Interlake should not be able to introduce evidence of its cross-claim for indemnification, costs and attorneys' fees because

such evidence would be irrelevant. (*Id.* at 2-3, 5.)[19] Fraser also argues that the Shipbuilding Contract is inapplicable because "[p]laintiff was performing shell plate work, . . . which was prescribed by a separate purchase order from Interlake to Fraser for routine winter maintenance work and certain repair work." (*Id.* at 5.)

Interlake opposes this motion, arguing that Fraser's request "is both improper and premature" as it is truly a request for summary judgment and assumes that the *Jackson* was a "vessel," which is the first question for the jury to answer. (Dkt. #266 at 1.) As the jury has not yet decided if the *Jackson* was a vessel under the LHWCA, the applicability of that Act remains uncertain. (*Id.* at 4-5.) Further, Interlake argues that if the *Jackson* was a vessel (and federal law applies, prohibiting contractual indemnification), then Fraser also breached its obligation to secure insurance coverage for plaintiff's claim; and if the *Jackson* was not a vessel (and state contract law applies), then Fraser breached its obligation to indemnify Interlake. (*Id.* at 5-6.) Additionally, Interlake contends that Fraser's argument about the inapplicability of the Shipbuilding Contract is wrong because: (1) the insurance clause required Interlake to be listed as an additional insured on Fraser's general marine liability insurance policy throughout the work on the *Jackson*; (2) the Shipbuilding Contract required Interlake be insured for any claims asserted by Fraser's employees, not just those arising under the repowering project; (3) assuming the type of work Holder performed mattered, the court recognized a factual dispute on that topic; (4) plaintiff's alleged

---

[19] In a supplemental brief following the deposition of Interlake's expert, Walter F. Curran, Fraser argues that Curran's opinions regarding the cross-claims should be excluded because he lacks appropriate qualifications and fails to provide a foundation. (Dkt. #246 at 3-4.) The court will RESERVE on this, permitting Interlake to file a response ***by 4:30 p.m. on April 11, 2018***, and will hear oral argument on this point at the final pretrial conference, if necessary.

exposure to lead in the cafeteria connects his injury with the repowering project; and (5) if plaintiff was doing winter work, and again that distinction mattered, that work was also subject to similar terms and conditions. (*Id.* at 7-10.)

As the court explained at summary judgment, "[t]rial will proceed on a trifurcated basis: first, the jury will determine whether the *Jackson* was a vessel at the time of plaintiff's injuries; then it will determine liability; finally, if the jury finds liability, it will calculate damages." (Dkt. #149 at 45.) Thus, it is premature to conclude that the LHWCA applies, let alone that it bars Interlake's cross-claims. Second, the court recognized at summary judgment that the parties disagree whether plaintiff was tasked with working on the repowering or another project, so it is also premature to determine the applicability of the Shipbuilding Contract. Accordingly, Fraser's MIL No. 1 is DENIED at this time. The court will address with the parties at the final pretrial conference what, if any, issues would remain for the jury depending on its ruling as to the *Jackson's* status as a vessel.

## B. MIL No. 2: Motion to Sever Interlake's Cross-Claims.[20]

Alternatively, Fraser seeks to sever Interlake's cross-claims under Rule 21. (Dkt. #187 at 6.) Arguing first that courts within the Seventh Circuit "routinely" sever contract indemnification cross-claims "from the underlying liability inquiry when severance furthers the interests of justice, convenience, simplicity, and judicial economy," Fraser explains that the Seventh Circuit considers these claims to be "discrete and separate" from direct liability

---

[20] Defendant Fraser is renewing its request for severance that it initially filed on December 1, 2017 (*see* dkt. #127), on which the court reserved at summary judgment (*see* dkt. #149 at 2 n.3). Fraser has also filed a motion for leave to file a reply brief on the severance question. (Dkt. #275.) As the court has considered the reply, that motion is GRANTED.

and recognizes that severance can simplify proceedings, avoid resolution of matters that may be unnecessary, and avoid prejudice to the parties. (*Id.* at 6-7.) First, Fraser argues that severance will prevent the jury from considering evidence of indemnification and insurance agreements, which if considered would make it "virtually impossible for the jury to separate the fact that Fraser agreed to assume responsibility and liability over the issues that led to the plaintiff's alleged injuries from the ultimate allocation of liability to Interlake." (*Id.* at 8-9.) Second, Fraser contends that a joint trial would be prejudicial to plaintiff because "there is no reason to determine Fraser's liability at trial because Fraser's payment of benefits will have no impact on Plaintiff's ultimate recovery from the remaining defendants." (*Id.* at 12.)[21] Third, Fraser argues that severing the cross-claims would "serve[] the interest of convenience, simplicity, and judicial economy" because Fraser would then not need to sit through the entire trial; if Interlake prevails on its defense, its cross-claim would be mooted; and no limiting instruction would be necessary on the issue of Fraser's liability. (*Id.* at 12-13.) The overlap of witnesses and facts is not enough to prevent severance. (*Id.* at 14.)

Interlake opposes this request, arguing that severance "would be inefficient and prejudicial" because the cross-claims involve many of the same issues and witnesses. (Dkt. #266 at 2.) Specifically, Interlake explains that Fraser's defense to the cross-claims is partially dependent on the jury's determination as to whether the *Jackson* was a vessel and also on the jury's resolution of the kind of work plaintiff was performing when he was

---

[21] Fraser does acknowledge that "the analysis of Fraser's contractual assumption of liability is inseparable from the underlying liability inquiry." (Dkt. #187 at 12.)

injured. (*Id.* at 11.) Accordingly, Interlake argues that it would not only be inefficient to re-litigate these issues in a separate trial, but would present a risk of inconsistent jury findings. (*Id.* at 11-12.)

Interlake also contends that there is no risk of violating Rule 411 because the cross-claim is that Fraser failed to secure required liability insurance and Rule 411 protects a person from inferences regarding their insured status. (*Id.* at 12.) Further, Interlake argues that "Fraser's culpable conduct is an inevitable part of this trial" because Interlake's involvement resulted from Fraser breaching a contract requiring it to safely remove lead paint. (*Id.* at 13.) Finally, Interlake reiterates its argument that regardless of how the jury comes out on vessel status, Fraser owes it money -- either through indemnity or because of contract breach. (*Id.*)

Rule 21 permits a court to "sever any claim against a party." Fed. R. Civ. P. 21. Doing so "creates two discrete, independent actions, which then proceed as separate suits." *Gaffney v. Riverboat Servs. of Indiana, Inc.*, 451 F.3d 424, 441-42 (7th Cir. 2006). Where the claims are "discrete and separate," a district court may sever them. *Id.* at 442 (quoting *Rice v. Sunrise Express*, 209 F.3d 1008, 1016 (7th Cir. 2000)). To be "discrete and separate," however, "one claim must be capable of resolution despite the outcome of the other claim." *Id.*[22]

Here, the court cannot say that Interlake's cross-claim against Fraser is "discrete and separate" from plaintiff's suit against defendants. To begin, the applicability of the

---

[22] On the other hand, "bifurcation under Rule 42(b) is appropriate where claims are factually interlinked, such that a separate trial may be appropriate, but final resolution of one claim affects the resolution of the other." *Gaffney*, 451 F.3d at 442.

indemnification provision of the Shipbuilding Contract depends on whether the LHWCA applies, which is dependent on the jury's determination of whether the *Jackson* was a vessel when plaintiff was injured. *Cf. id.* at 443 (noting that the indemnification counterclaim was based on an insurance clause and was "completely independent, both theoretically and practically," and the indemnification cross-claim was "independent" and "easily separable for analysis").

In its reply brief on this motion, Fraser mainly argues that it has been prejudiced by "the condensed timeline caused by Interlake's delayed cross-claims," which were initially asserted "forty-nine days after the dispositive motion deadline." (Dkt. #275 at 2-3.) Fraser explains that it "has not had any opportunity to address the multitude of legal issues involved" because it was deprived of "the opportunity to fully develop the issues it hopes to resolve through potential dispositive motions." (*Id.*) Finally, Fraser argues that "the interests of justice require a reasonable opportunity for full and complete discovery and an opportunity for briefing on dispositive motions that will resolve or narrow the issues." (*Id.* at 6.)

Much of Fraser's argument is overblown. First, while Fraser speaks generally of a need for time to address legal and factual complexities, it does a poor job of articulating why those cannot still be addressed in the time leading up to trial, at trial or in motions after trial. Second, following Interlake's assertion of the cross-claims, Fraser had 139 days in which to seek discovery -- including 71 days before discovery closed -- before motions in limine were even due. Throughout that time, Fraser slept on its rights and failed to ask for

whatever it now claims is lacking.[23]  The court is especially unsympathetic considering that it adjusted the parties' expert disclosure schedule in January, permitting additional expert discovery after the January 5 discovery cutoff, making Fraser's failure to seek any needed relief even less explicable.  Third and finally, the court will take up at the final pretrial conference the question of what, if any, factual issues remain for the jury to decide Interlake's cross-claims after the first phase of trial.[24]  Accordingly, Fraser's renewed motion to sever (MIL No. 2) is DENIED.

## IV. Defendant Interlake's Motions in Limine

### A. MIL No. 1: Exclude Opinions of Dr. David Parker & Dr. John Crossen (dkt. #186).

Interlake raises *Daubert* challenges to the opinions of Drs. Parker and Crossen because "the [specific and] general causation opinions of both experts . . . improperly attempt to extrapolate from the conclusions of studies of the health effects of *chronic* lead exposure, as measured by *bone* lead levels, that Holder's *acute* lead exposure, as measured by *blood* lead levels, caused his symptoms" and the specific causation opinions are not based

---

[23] While Fraser may argue that it had a pending motion to sever, the court is generally unsympathetic.  Yes, the court reserved on the motion to sever when it issued its summary judgment decision on January 17, 2018 (*see* dkt. #149 at 45), but this merely placed Fraser on notice that the court might *not* sever.  By choosing to do nothing to prepare for that real possibility, Fraser was rolling the dice.  Indeed, Interlake's cross-claim was not severed, meaning that Fraser was still held to the existing schedule.  Fraser could have, but did not, seek relief, nor did it seek some nebulous, needed discovery.

[24] The court notes that if there is additional discovery that Fraser believes is still lacking in light of pretrial disclosures, it is *still* free to seek relief from the court.

on "a reliable differential etiology."[25]  (Dkt. #186 at 1, 4 (emphasis original).)  Interlake argues that these general opinions should be excluded because neither Parker nor Crossen "'reliably applied' established principles and methods to the facts," such that they "failed to reliably establish that exposure to lead, at the dose and duration Holder experienced, could cause the [claimed] injuries."  (*Id.* at 11, 14.)  Essentially, Interlake argues, Drs. Parker and Crossen's general causation opinions "rest on an invalid syllogism": "a) lead can cause permanent injuries as a function of cumulative dose; b) Holder had acute exposure to lead for 37 work days; therefore, c) Holder's acute exposure to lead caused permanent injuries."  (*Id.* at 17.)

As to specific causation opinions, Interlake argues that they should also be excluded, either because (1) the general causation opinions on which they are based are inadmissible or (2) they are similarly not based on "a reliable differential etiology."  (*Id.* at 18-19.) Again, Interlake argues, the experts did not properly "rule in" lead exposure because they relied on a survey sent to plaintiff with the stated purpose of "assess[ing] the effects of lead exposure resulting from [Holder's] work at Fraser Shipyards and on the Herbert C. Jackson"; likewise, Parker failed to rule in other possible causes, including by failing to inquire meaningfully about plaintiff's alcohol and drug use.  (*Id.* at 19.)  Interlake adds that both experts failed to properly rule out other potential causes, including drug and alcohol use and his career as a welder.  Indeed, neither expert knew his base-line neurocognitive performance prior to his work at Fraser; Parker did not know Holder's prior

---

[25] Interlake explains that a "differential diagnosis" leads to an opinion about a specific ailment's identity, while a "differential etiology" identifies a cause through an expert first ruling in all possible causes and then ruling out those that do not apply.  (Dkt. #186 at 18.)

blood lead levels; and Crossen acknowledged that often patients are unaware of neurocognitive symptoms. (*Id.*) Accordingly, Interlake argues that relying on the temporal closeness of Holder's claimed injuries and his work at Fraser is insufficient to show causation. (*Id.* at 20.)

Finally, Interlake challenges Dr. Crossen's opinions as "repeat[ing] Dr. Parker's opinions based on articles Dr. Parker reviewed," and it argues that because "Crossen did no independent work on the subjects of general and specific causation, his opinions on those subjects add nothing new." (*Id.* at 21.)

Despite often relying on the same or similar arguments, plaintiff chose to respond separately concerning each expert. (*See* dkt. ##262, 265.) Regarding Dr. Parker, plaintiff argues that Interlake's "concerns can be addressed at trial through 'vigorous cross-examination,'" and that regardless, Parker's opinions rely on sufficient facts or data and resulted from reliable principles and methods. (Dkt. #262 at 6; *see also id.* at 21.) As to the latter, plaintiff explains how Parker devised the adult lead survey, verified the responses, and examined Holder's history, including where he lived, his hobbies, substance use, education and employment history, as well as outlines Parker's reliance on "an extensive body of scientific, medical, and government literature to develop his opinions," adding that he chose studies based on their quality. (*Id.* at 7-9, 13.) In response to criticism that the studies Dr. Parker relied upon were inapplicable because they looked at "different populations and different exposure periods," plaintiff notes that Parker explained the studies relied on different populations because plaintiff Holder's colleagues had not been studied, and the studies showed similar symptoms with *shorter* exposure. (*Id.* at 17.)

Next, plaintiff argues that Parker appropriately performed a differential etiology, ruling out other potential causes for plaintiff's injury, including drug or alcohol use and smoking. (*Id.* at 18; *see also id.* at 26-27.) Specifically, Dr. Parker points out that: plaintiff was fine before he began working on the *Jackson*, and his symptoms started after; there was no evidence showing alcohol caused his problems; nothing in his personal history (work, hobbies, family history, medical history, substance use, residential history) accounted for his neurocognitive problems; and occupational lead exposure, in his opinion, could cause long-term neurological issues. (*Id.* at 18-20.) Plaintiff then argues that Parker "properly extrapolated" from the studies he relied upon, "including studies that specifically discussed shorter term exposures" so that his opinions are neither *ipse dixit* nor improper syllogisms. (*Id.* at 25-26.) Finally, plaintiff argues that defendant's concern about Dr. Parker lacking baseline testing for neurocognitive functioning and blood lead levels is "a non-sequitur" or "circular," because healthy people do not have these tests done without reason. (*Id.* at 27.)

As to Dr. Crossen, plaintiff argues that: (1) Interlake "misrepresents" both his testimony and his report, and (2) Dr. Crossen's actual report and testimony show that his opinions are admissible under Rule 702 and *Daubert*. (Dkt. #265 at 3.) Specifically, plaintiff explains that Dr. Crossen noted plaintiff's exposure was *greater than* just the 37 days he was working on the *Jackson*, because he brought lead into his home from the jobsite on his person. Accordingly, Dr. Crossen considered the exposure "chronic," not "acute." Dr. Crossen also acknowledged that substance abuse can lead to neurocognitive problems, but opined that it was *not* the cause in this case, as he had: (1) ruled out substance abuse; (2) ruled out exposure at other jobs because plaintiff previously had no symptoms and he

39

had significantly lower blood lead levels in 2014; and (3) noted that the timing of the onset of plaintiff's symptoms remains disputed. (*Id.* at 6-8.)

Next, plaintiff argues that Dr. Crossen did not need to do his own research because he appropriately relied on the research provided by Dr. Parker, using an average baseline for comparison as appropriate. (*Id.* at 9-10.) Plaintiff reprises his arguments above about the reliability of the studies relied on and that the general causation opinions were neither improper syllogisms nor *ipse dixit*. (*Id.* at 11, 15.) As for Dr. Crossen's specific causation opinions, plaintiff notes his opinion that it was "unlikely" plaintiff would have been "blind to neurocognitive symptoms" and reiterates that people do not have blood tests or neurocognitive evaluations, unless they have specific problems. (*Id.* at 16-17.) Finally, plaintiff notes that Crossen relied on Dr. Parker's research because it supported his independent causation opinions. (*Id.* at 18.)

As the court explained above when addressing plaintiff's third motion in limine, the standard for admitting expert testimony is governed by *Daubert* and Rule 702. *See supra* § I.C. The expert must be qualified; her methodology must be reliable; and the testimony must be helpful to the factfinder. *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The opinions of Drs. Parker and Crossen are both admissible under this standard. Interlake's main challenge to their general causation opinions is that the experts improperly extrapolated from studies; however, absent scientific consensus that the studies have no place in assessing intense (as opposed to chronic) exposure to lead, this criticism goes to the weight of the opinions, not their admissibility; and accordingly, it is appropriate fodder for cross-examination. That none of the studies involved identical exposure -- in

terms of length and precise method -- is unremarkable.  Likewise, Interlake will be able to cross examine the experts about the difference between blood and bone lead levels.  As for Interlake's criticisms of the specific causation opinions, these too go to weight, not admissibility.  Interlake will be able to cross examine about the differential etiologies performed and about Dr. Crossen's reliance on Parker's research.  Accordingly, Interlake's MIL No. 1 is DENIED.

## B.  MIL No. 2: Exclude Opinions of John W. Sullivan (dkt. #198).

Interlake also seeks to exclude the opinions of plaintiff's marine expert witness. John W. Sullivan.  (Dkt. #198 at 1.)  Sullivan would opine that Interlake breached a duty to intervene and negligently exposed plaintiff to lead as he worked at Fraser Shipyards on the *Jackson*, while Interlake complains that his opinions are based on improper contract interpretation, incorrect reading of documents, the wrong legal standards, imputations of corporate knowledge that are inappropriate for an expert to provide, improper legal conclusions, and unsupported conclusions.  (Dkt. #214 at 1-3.)

To Interlake's general objections, plaintiff responds in kind, beginning first that "Mr. Sullivan is imminently qualified to testify as a standard of care and breach witness." (Dkt. #272 at 6.)  Next, he argues that Sullivan can help the jury based on his specialized knowledge, and he accuses Interlake of creating a strawman by reducing Sullivan's lead paint opinion to the simple proposition that the sheer presence of lead is dangerous, rather than that Interlake's failure to test painted surfaces to determine if lead remediation was negligent.  (*Id.* at 6-8.)  Plaintiff further argues that Interlake's complaint about Sullivan's duty opinion "is too vague for response and does not qualify for *in limine* relief" and then

asserts unhelpfully that Sullivan's report is "based on sufficient facts or data." (*Id.* at 8-9.) Plaintiff also argues equally unhelpfully that "Mr. Sullivan has shown that his experience leads him to the conclusions he has reached, that his experience is a sufficient basis for his opinions, and that his experience has been reliably applied to the facts," while denying that he is "not offering any improper legal opinions," as Rule 704 permits experts to opine on ultimate issues. (*Id.* at 11.) Finally, in response to Interlake's own overblown attack, plaintiff makes approximately fifteen assertions addressing or challenging statements in Interlake's motion about Sullivan's report. (*Id.* at 15-19, 21-27.)

As the court has already discussed the appropriate standards under *Daubert* and Rule 702, *see supra* § I.C., it will not repeat the analysis except to confirm that Rule 704 does indeed permit expert witnesses to opine on "ultimate issue[s]." Fed. R. Evid. 704(a). Such testimony may even be especially relevant and helpful to a factfinder. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). Even so, "the expert's role is 'limited to describing sound professional standards and identifying departures from them.'" *Id.* (quoting *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997)).

For purposes of addressing them, the court will consider Interlake's varied grounds for barring the admission of Sullivan's opinions under *Daubert* under three general categories: (1) it was not his role to interpret the contract between Fraser and Interlake; (2) his opinions on Interlake's "duty" lack a reliable foundation and are not supported by sufficient facts and data; and (3) many of his opinions are not helpful to the jury "because they are not based on the correct legal standard, are contrary to law, or invade the province of the jury." (*Id.* at 8.) Turning to Interlake's objections, Sullivan does *not* interpret the

Shipbuilding Contract. Rather, he quotes it twice. (*See* dkt. #215 at 3, 5-6.) There is a difference. His definition and discussion of "availability" is not amending the contract, as much as educating the jury about the type of control a shipowner would typically have while its ship is at a shipyard for repairs. If nothing else, this may be useful to the jury in deciding the issue of control while the *Jackson* was at Fraser Shipyards.[26] Likewise, Sullivan does not conflate the legal duty of active control with the duty to intervene. Specifically, Sullivan's opinions that Wolny, and by extension Interlake, needed to act to protect the workers from lead exposure is not applying incorrect law on the duty of active control, but instead are premised on plaintiff's version of disputed facts -- even more specifically, that Interlake maintained active control at the time of plaintiff's injuries; this likewise is not improper contract interpretation, but assisting the jury in interpreting the facts based on his unique expertise.[27]

Similarly, Sullivan's opinions based on OSHA standards may be relevant to the jury's determination as to whether Interlake met its duty of care, just like Dr. Jones's opinions, as discussed *infra* § IV.C. Also, as previously discussed, Sullivan never opined

---

[26] Curiously, after charactering Sullivan as "qualified by his experience to review the repowering contract and other facts and circumstances in this case," plaintiff himself suggests that Sullivan appropriately clarified the meaning of the contract. (Dkt. #272 at 18-19.) The court does not read his opinion as clarifying the contract, but instead as detailing his experience with similar contracts and how the owner's representative typically functions. (*See* dkt. #215 at 6.) To the extent he is doing anything more than that, the court agrees with Interlake that he has exceeded his role as a maritime expert and invaded the role of the court as the interpreter of the law of the case.

[27] Interlake also challenges other aspects of Sullivan's opinions as being unsupported or based on a faulty premise, mainly because Sullivan's opinion relies in part on plaintiff's version of disputed facts or interpretation of documents. (*See e.g.*, dkt. #214 at 23-25.) As these facts or interpretations are disputed, it will be for the jury to decide ultimately whether Sullivan's opinions are supported by the evidence, not for this court.

that the sheer presence of lead created a dangerous condition. Instead, Sullivan opined that ships of the *Jackson's* age were known in the industry to contain lead paint, and a reasonable person would have tested for lead's presence and altered construction accordingly; and the failure of Fraser, Capstan and Interlake to test the *Jackson* for lead "unnecessarily and unreasonably exposed the workers . . . to the dangerous condition of the exposure to lead toxins." (Dkt. #215 at 4-5.) Likewise, this opinion may be relevant and potentially helpful to the jury.

On the other hand, as the court recognized at summary judgment, Sullivan's proposed standard for whether the *Jackson* was a vessel (a comparison to being "permanently moored") is not the correct legal standard. (Dkt. #149 at 20-21.) As noted then, "it is improper for an expert to offer opinions inconsistent with the appropriate legal standard." (*Id.* at 21.) Further, Interlake is correct that Sullivan may not testify to the intent or actual knowledge of Interlake, Capstan or Fraser (or their agents), nor will he be able to testify that "the conduct of Interlake, Capstan and Fraser was negligent, willful and wanton or worse in degree" (dkt. #215 at 11, 13). *See Dahlin v. Evangelical Child and Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002) (declining to permit expert testimony on defendant's intent because expert could only render such an opinion "by drawing inferences from the evidence" and he was not "any more qualified than an ordinary juror to draw those inferences"). Accordingly, this motion is GRANTED IN PART and DENIED IN PART.

**C. MIL No. 3: Exclude Opinions of Dr. Rachael M. Jones (dkt. #199).**

In its third motion in limine, Interlake seeks to exclude the opinions of plaintiff's

industrial hygiene expert, Dr. Rachel M. Jones, under *Daubert*. (Dkt. #199 at 1; dkt. #213 at 1-2.) First, Interlake objects to Jones's opinion that it was a "controlling employer" and an "exposing employer" under OSHA's Multi-Employer Citation Policy, so that it owed a duty to Holder to prevent exposure to lead hazards. In particular, Interlake points out that (a) it did not employ plaintiff and (b) OSHA cited Fraser -- *not* Interlake -- and did not issue any multi-employer citations. (Dkt. #213 at 6-7.) Second, Interlake argues that Dr. Jones's opinion is "inconsistent with the applicable legal standard," asserting that even if the OSHA Multi-Employer Citation Policy applied, using Interlake's relationship with Wolny to create a duty to Holder and Jones conflates "power to correct" with the maritime duty to intervene, which are different and distinct.[28] (*Id.* at 7-10.) Third, Interlake argues that Jones's opinions rest on two faulty premises: (1) she ignores the terms of the Shipbuilding Contract, which outline Wolny's role; and (2) she improperly extrapolated from Wolny's weekly reports. (*Id.* at 10-12.) Fourth, Interlake argues that Dr. Jones is not qualified to offer her opinions because she lacks "specialized training or expertise in determining whether an employer should be cited," has never been responsible for OSHA compliance, and has never worked for OSHA or issued an OSHA citation. (*Id.* at 13.) Finally, Interlake argues that Jones's opinions are otherwise excludable under Rule 403. (*Id.* at 13-14.)

Plaintiff responds that none of Interlake's arguments provides a basis to bar Jones's testimony. (Dkt. #260 at 3.) First, plaintiff argues that Jones is "a qualified expert witness

---

[28] Interlake contends that because it did not employ plaintiff, it could not have a duty to protect him (and thus cannot be an "exposing employer"), and because it did not have "general supervisory control over the worksite," it could not be a "controlling employer. (Dkt. #213 at 8-9.)

whose testimony (1) is based upon sufficient facts or data, and (2) is the product of reliable principles and methods." (*Id.* at 7.)  Specifically, plaintiff explains that Jones is an educator responsible for training graduate students on anticipating, assessing and preventing workplace hazards; in her courses, she teaches about how to interpret and apply OSHA regulations; she has assessed occupational hazards in research for OSHA; and the practical experiences that Interlake argues are lacking do not make her unqualified.  (*Id.* at 7-8.) Second, plaintiff argues that her opinions are relevant, noting that the multi-employer doctrine places OSHA duties on employers who impose risks on employees of other employers.  (*Id.* at 8-9.)  Further, plaintiff notes that the OSHA regulations may be relevant to determining whether there was an unreasonable risk of harm even if OSHA did not issue any formal, multi-employer citations.  (*Id.* at 9.)  Third, plaintiff argues that Jones applied the appropriate legal standard based on her training, knowledge and experience, reiterating that the OSHA regulations are relevant to the standard of care (regardless of which substantive law applies).  (*Id.*)  Fourth and finally, plaintiff disputes that Jones's opinions would be inadmissible under Rule 403.  (*Id.* at 12.)

Again, the court will not repeat the applicable standard for admitting expert testimony, as set forth in *Daubert* and Rule 702.  *See supra* § I.C.  Suffice it to say that defendant's motion is DENIED because:  (1) Dr. Jones qualifies as an expert based on her training and education; and (2) her opinions are relevant to the appropriate standard of care, regardless of how the jury determines the vessel inquiry.  The court will RESERVE and hear oral argument at the final pretrial conference on whether OSHA's Multi-Employer Citation Policy is a legal question for the court.  Each side may have until April 11, 2018

at 4:30 p.m. to brief this issue.

### D. MIL No. 4: Exclude Evidence of Post-Employment Knowledge, Conversations, and Events (dkt. #218).

In its fourth motion in limine, Interlake asks the court to exclude argument or evidence concerning Interlake's conduct, the conduct of others, and anything Interlake learned or knew after February 29, 2016 (when plaintiff stopped working for Tradesmen International), such as later Weekly Repower Reports. Interlake argues all of this post-employment evidence, "is irrelevant to Holder's claims against Interlake, which turn on what Interlake did (or did not do) while Holder worked on the HERBERT C. JACKSON repowering project." (Dkt. #218 at 1; dkt. #219 at 1.) More specifically, Interlake asserts that the maritime duties of active control and to intervene cannot turn on events postdating a claimant's work on the vessel. Instead, the first turns on whether the vessel owner had control over the hazard causing the injury, while the second turns on the shipowner's knowledge of (1) the danger prior to the injury and (2) the contractor's obviously improvident decision not to address the danger.[29] (Dkt. #219 at 3-4.) Likewise, Interlake argues that post-employment information is irrelevant under plaintiff's Wisconsin common law theory, because the question is whether Interlake ceded control over the *Jackson* to Fraser at the time. (*Id.* at 4.) Finally, even if relevant, Interlake argues that this evidence, should be excluded under Rule 403 because it would: (1) be unfairly

---

[29] Interlake argues that the duty to intervene is not applicable here because it had no duty to protect against risks inherent in carrying out the contract for repairs. (Dkt. #219 at 3 n.2.) Interlake raises this argument as well in its sixth motion in limine and the court addresses this more fully *infra* § IV.F.

prejudicial as it "suggests to the jury that it may hold Interlake liable for acts occurring after Holder's employment," (2) mislead the jury through suggestion of "an improper basis for liability," and (3) "confuse the issue of whether Interlake breached any duty it actually owed to Holder." (*Id.* at 5.)

Plaintiff objects that "[t]he challenged evidence is relevant to several issues . . . including exposure to lead in the workplace, causation, knowledge of unsafe working conditions and liability for punitive damages." (Dkt. #251 at 1.) First, plaintiff argues that discovery of his lead exposure is tied to events after his employment, as it was at the end of March 2016, that work on the *Jackson* ceased because of positive lead poisoning tests, and plaintiff was advised by a former colleague to get tested; and in April, plaintiff's blood work showed an elevated blood lead level. (*Id.* at 2-3.) As such, post-employment events "make[] it more probable that plaintiff suffered from exposure to lead while working aboard the *Jackson* and that his work aboard the *Jackson* caused his injuries." (*Id.* at 4.) Second, plaintiff argues that he must be permitted to rebut the opinion of Interlake's expert, Walter Curran, that it was not until March 2016 that Interlake realized the dangerous condition created by the lead through use of the preceding weeks' Weekly Repower Reports, indicating that Fraser needed a procedure for dealing with lead paint, that no lead paint testing had been performed, and that there was no safety manager. (*Id.* at 5-6.)[30] Finally, plaintiff argues that actions by Interlake after Holder's employment are relevant to plaintiff's claim for punitive damages, as they "are consistent with [Interlake's]

---

[30] Plaintiff also argues that later Weekly Repower Reports are relevant to whether the *Jackson* was a vessel. (Dkt. #251 at 6.)

position of non-activity during the period of plaintiff's exposure and will assist a jury in determining if Interlake acted willfully or recklessly during the exposure period." (*Id.* at 9-10.)

For the reasons outlined by plaintiff, the court finds defendant's argument that post-employment knowledge and events are irrelevant and contradicted by the record on a blanket basis. At a bare minimum, some of this information goes to causation, knowledge and, potentially, even punitive damages. Accordingly, Interlake's MIL No. 4 is DENIED, although Interlake will be given the opportunity to make a more targeted motion as to the admissibility of specific, post-employment evidence in certain phases of the trial, if not all.

## E. MIL No. 5: Exclude Evidence of Subsequent Remedial Measures (dkt. #221).

Perhaps recognizing MIL No. 4 was absurdly sweeping, Interlake also seeks to prevent plaintiff from evidencing or commenting on subsequent remedial measures. (Dkt. #221 at 1.)[31] First, Interlake argues that the Circular Letter Interlake sent to its crewmen two months after Holder stopped working on the *Jackson* is irrelevant or, if relevant, constitutes an excludable subsequent remedial measure. (Dkt. #222 at 1-2.) The only possible relevance, Interlake argues, would be as "evidence of negligence or culpable conduct," which is impermissible under Fed. R. Evid. 407. (*Id.* at 2.) Second, Interlake argues that the Circular Letter should be excluded under Rule 403 because it, and other

---

[31] Interlake recognizes that this motion would be mooted if the court grants its request to bar plaintiff from introducing evidence of Interlake's conduct or knowledge it acquired after Holder stopped working on the *Jackson*. (Dkt. #222 at 1.) However, because the court denied that request the court addresses Interlake's fifth motion in limine.

subsequent remedial measures, "are unfairly prejudicial precisely because they suggest to the jury that it may hold Interlake liable for taking corrective measures, even though the law encourages these measures and bars a factfinder from drawing precisely this inference." (*Id.* at 2-3.)

Plaintiff represents that he does not intend to seek admission for the Circular Letter referenced in Interlake's motion. (Dkt. #253 at 1.) However, plaintiff otherwise opposes Interlake's request as "overly broad" because it fails to identify any other subsequent remedial measures as falling within the purview of Rule 407. (*Id.* at 1-2.)

Accordingly, the portion of Interlake's MIL No. 5 with respect to the Circular Letter is GRANTED as unopposed. However, plaintiff is correct that defendant has provided insufficient information to identify, much less exclude, other, so-called subsequent remedial measures. Since it is unclear if those as-yet-unidentified measures would be admissible or inadmissible under Rule 407, this portion of the motion is DENIED.

### F. MIL No. 6: Exclude Equivalence Testimony and Argument (dkt. #223).[32]

Interlake next seeks to prevent plaintiff "from arguing to the jury, or presenting testimony suggesting, that knowledge of lead paint on the HERBERT C. JACKSON is, or is equivalent to, an awareness of 'the dangerous condition of the lead paint,'" because awareness of its presence alone cannot show awareness of a related dangerous condition. (Dkt. #223 at 1.) Interlake emphasizes in particular that under maritime law, "a vessel's

---

[32] Interlake notes that this request would be mooted by the jury determining that the *Jackson* was not a vessel, which would resolve plaintiff's maritime tort claim, removing argument on the duty to intervene. (Dkt. #224 at 1 n.1.)

awareness of a condition, standing alone, 'does not imply knowledge that the condition is dangerous.'" (Dkt. #224 at 3-4 (quoting *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1330 (5th Cir. 1985)).) Even more specifically, Interlake argues that "Holder first needs to establish dose toxicity and must then proffer evidence . . . showing that Interlake was aware of this toxic dose." (*Id.* at 4.)

Plaintiff opposes this motion, asserting that "Interlake seeks to limit Plaintiff's arguments about what exactly constitutes a 'dangerous condition' under the *Scindia* Duty to Intervene." (Dkt. #256 at 1.) First, plaintiff argues that it is for the jury to determine what constitutes a "dangerous condition" and that OSHA's permissible exposure limit for lead is not the marker for a dangerous condition. (*Id.* at 2; *see also id.* at 4-8.) Second, plaintiff argues that whether the work on the *Jackson* was obviously improvident and whether it was without a lead safety program are also questions for the jury, as the court recognized at summary judgment. (*Id.* at 2-3.)

The court agrees with plaintiff. If the jury determines that the *Jackson* was a vessel when plaintiff was working on it, whether Interlake had a duty to intervene under maritime law will turn on its knowledge of a dangerous condition caused by repairs being conducted around the lead paint, and its alleged knowledge that Fraser's allowing this condition to continue was "obviously improvident." (Dkt. #149 at 33.) These are questions for the jury. Moreover, at this point, the court continues to reject the view that the risk of lead poisoning is inherent in carrying out the work under the contract. *Cf. Casaceli*, 774 F.2d at 1329-31 (explaining that a ship owner does not need to protect against inherent risks of carrying out the contract, where diver died underwater in opaque water because "[e]very

underwater condition entails some hazard to a diver" and that where decedent alone had knowledge of the danger).  Accordingly, Interlake's MIL No. 6 is DENIED.

### G. MIL No. 7: Exclude Untimely Expert Opinion of Eric Pescinski (dkt. #225).

Finally, Interlake seeks to exclude Eric Pescinski's opinion on "proper procedures for lead based paint abatement" as an improper rebuttal, because it "does not contradict, address, or analyze evidence on the same subject matter identified by another party." (Dkt. #226 at 1.)  Under Rule 26(a)(2)(D), Interlake asserts that rebuttal disclosures must rebut or contradict evidence on a topic identified by another party in its expert disclosures and circuit law limits rebuttal reports to "contradicting or rebutting evidence."  (*Id.* at 4-6 (internal citation omitted).)  Since no party offered an expert report on lead abatement on ships, Interlake maintains that Pescinski's opinion should be excluded under Rule 37, is inadmissible under Rule 402, and fails to comply with Rule 26(a)(2)(D).  Even if admitted, Interlake argues it would only confuse the jury and cause prejudice substantially outweighing its probative value.  (*Id.* at 6.)

In response, plaintiff contends that Pescinski's report actually rebuts opinions by Interlake's expert, Walt Curran.  (Dkt. #254 at 2.)[33]  In particular, Curran "discusses at length the 'duties and obligations of . . . steamship lines as they relate to repairs/reconstruction conducted on board ships . . .,'" discusses the *Scindia* duties, and

---

[33] Plaintiff also argues Pescinski's qualifications as an expert under Rule 702 (dkt. #254 at 3-4), while acknowledging that Interlake did not argue otherwise (*id.* at 2; *cf.* dkt. #226 at 2).  Plaintiff further argues that Pescinski can testify beyond opinions (dkt. #254 at 7-9), but the court need not address this argument either because it is one of pure semantics.  Here, the dispute is whether Pescinski can inform the jury what a lead abatement program looks like, and by extension what it should have looked like on the *Jackson*.

"opines that Interlake had no Duty to Intervene with respect to the work on the [*Jackson*]."
(*Id.* at 4.) However, plaintiff asserts, Curran did *not* consider what a proper lead abatement program would look like, and Pescinski provides the missing contours of such a program. (*Id.* at 5.) Plaintiff further contends that Pescinski's opinion about a proper lead abatement program would be helpful to the jury in determining whether a duty to intervene arose. (*Id.* at 6.)

Rebuttal evidence -- including rebuttal expert reports -- is meant "to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir. 2008) (quoting *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001)) (internal quotation marks omitted). At minimum, Pescinski's opinion concerning what an appropriate lead paint abatement program would look like is appropriate rebuttal as it "defuse[s] the impact" of Curran's opinions on the duty to intervene. Accordingly, Interlake's MIL No. 7 is DENIED.

## ORDER

IT IS ORDERED that:

1) Plaintiff's motions in limine (dkt. #205) are GRANTED IN PART and DENIED IN PART as set forth above.

2) Defendant Capstan's motions in limine (dkt. #192) are GRANTED IN PART, DENIED IN PART, and RESERVED IN PART as set forth above.

3) Defendant Capstan's supplemental motion in limine (dkt. #273) is RESERVED.

4) Defendant Fraser's motions in limine (dkt. #187) are DENIED, while its supplemental request (dkt. #246) is RESERVED.

5) Defendant Fraser's request to file a reply brief (dkt. #275) is GRANTED.

6) Defendant Fraser's initial motion to sever (dkt. #127) is DENIED.

7) Defendant Interlake's motions in limine (dkt. ##198, 221) are GRANTED IN PART and DENIED IN PART.

8) Defendant Interlake's motion in limine (dkt. #199) is RESERVED IN PART AND DENIED IN PART.

9) Defendant Interlake's motions in limine (dkt. ##186, 218, 223, 225) are DENIED.

10) Defendant Interlake's motions to join (dkt. ##263, 264) are GRANTED.

Entered this 10th day of April, 2018.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge